United States District Court
Southern District of Texas
**ENTERED**
May 26, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEVEN KURT BAUGHMAN, §
SPN #505318, §
§
Plaintiff, §
§
v. §          CIVIL ACTION NO. H-14-3164
§
SHERIFF ADRIAN GARCIA, *et al.*, §
§
Defendants. §

## MEMORANDUM AND ORDER

The plaintiff, Steven Kurt Baughman (SPN #505318), is presently in custody at the Harris County Jail (the "Jail"), which is operated by the Harris County Sheriff's Office ("HCSO") in Houston, Texas. Baughman has filed this lawsuit under 42 U.S.C. § 1983, asserting claims of inadequate medical care for type 2 diabetes, inadequate dental care, and retaliation for lodging a complaint about the level of medical and dental care that he has received. Baughman sues Harris County and the following defendants in their individual or personal capacity as supervisory officials and health care providers employed by HCSO at the Jail: (1) former Harris County Sheriff Adrian Garcia; (2) former Harris County Sheriff Ron Hickman; (3) former Executive Medical Director Dr. Michael Seale; (4) former Medical Administrator Bobby Davis; (5) Interim Executive Medical Director Dr. Marcus Guice; (6)

Physician's Assistant Sharon Lambi; (7) Dentist Dr. Edwin Chin; (8) Dentist Dr. Alan Harper; (9) Nurse Practitioner Beverly Howard; (10) Dietitian Cathy Rossi; and (11) Dietitian Renee Hinojosa.[1]

Five of the above-referenced defendants employed at the Jail in a supervisory capacity (Dr. Seale, Dr. Guice, Davis, Lambi, and Howard) have filed a joint motion for summary judgment [Doc. # 179], arguing that they are entitled to qualified immunity from Baughman's claims against them. The dentists (Drs. Chin and Harper) and one of the dietitians (Rossi) have filed a separate motion for summary judgment [Doc. # 183], which also raises the defense of qualified immunity. Harris County has filed a motion for summary judgment on its own behalf, arguing further that Baughman fails to make a valid claim for municipal liability under any theory against it [Doc. # 181]. Baughman has filed separate responses to these motions [Docs. # 188, # 190]. The defendants have filed several replies [Docs. # 193, # 195, # 196].

After considering all of the pleadings, the exhibits, and the applicable law, the motion for summary judgment filed by Drs. Chin and Harper is **DENIED**, in part, with respect to Baughman's claim that he was denied adequate dental care for tooth decay with deliberate indifference to a serious medical need in violation of 42 U.S.C. § 1983. The motions for summary judgment are **GRANTED** with respect to all other

---

[1] Fourth Amended Complaint [Doc. # 134], at ¶¶ 2-13.

claims for the reasons discussed below.

## I.    <u>BACKGROUND</u>

For the purpose of addressing the claims asserted in this case, it is helpful to first describe the plaintiff, his ailments, and the role, if any, played by the defendants in the medical and dental treatment that he has received at the Jail.  Unless otherwise noted, this portion of the Court's decision is based on facts that are undisputed by the parties.  All facts are viewed in the light most favorable to the plaintiff, as non-movant.[2]

### A.    **The Plaintiff**

Plaintiff Baughman has been in continuous custody of Harris County at the Jail since he was arrested on April 3, 2014.[3]  The average length of stay for detainees at the Jail is estimated at 74 days.[4]  A previously convicted felon who was on parole at the time of his arrest,[5] Baughman has now been detained at the Jail for over three years and is still awaiting trial on the criminal charges that remain pending against

---

[2]    *See Tolan v. Cotton*, — U.S. —, 134 S. Ct. 1861, 1866 (2014).

[3]    Fourth Amended Complaint [Doc. # 134], at ¶ 16.

[4]    *See* Guice Dep. [Doc. # 188, Ex. 1], at 136:20-23 (estimating that the length of stay is between 73 and 75 days on average); *but see* Seale Dep. [Doc. # 188, Ex. 2], at 121:23-122:13 (estimating that the average length of stay is 40 days).

[5]    Fourth Amended Complaint [Doc. # 134], at ¶ 16.

him in state court.[6]

When Baughman arrived at the Jail he reportedly alerted officials that he suffered from type 2 diabetes, which required insulin injections, and that he had "severe" pain due to several broken and decaying teeth.[7]  Baughman's pre-arrest history of severe tooth decay had already resulted in the extraction of more than ten teeth.[8] Baughman, who is presently 57 years of age, also arrived at the Jail with a host of other pre-existing conditions, including opioid dependence, chronic back pain, chronic kidney disease, gout, hypertension (high blood pressure), hyperlipidemia (high cholesterol), diabetic neuropathy, and morbid obesity.[9]

Baughman initially filed this case *pro se* on November 4, 2014, against

---

[6]    Court records reflect that Baughman currently has two active felony cases stemming from his April 2014 arrest.  Those cases are pending in the 174th District Court for Harris County, Texas, in *State of Texas v. Baughman*, Cause No. 153285001010 (aggravated assault with a deadly weapon), and *State of Texas v. Baughman*, Cause No. 142342101010 (felon in possession of a firearm).  A trial is reportedly scheduled for June 5, 2017.  *See* Harris County District Clerk's Office website, located at: www.hcdistrictclerk.com (last visited May 24, 2017).

[7]    *See* Baughman Decl. [Doc. # 190, Ex. 8], at 1-2; *see also* Inmate Complaint Form [Doc. # 190, Ex. 5], at 1 (Bates No. HC/Baughman 8268); Inmate Complaint Form [Doc. # 190, Ex. 9], at 1 (Bates No. HC/Baughman 8106).

[8]    HCSO Health Services Bureau Dental: Annual and Juvenile Exam Form [Doc. # 190, Ex. 14], at 1-2 (Bates No. HC/Baughman 5917) (filed under seal).

[9]    Guice Aff. [Doc. # 179-4], at ¶¶ 13, 15.

numerous defendants employed by Harris County and HCSO.[10]    After Baughman

submitted several amended and supplemental versions of his claims,[11] the Court

appointed counsel to assist him with his claims of inadequate medical and dental care,

which potentially implicate more than one policy or practice in place at the Jail.[12]

## B.    The Defendants

The lead defendant, Adrian Garcia, was the elected Harris County Sheriff from

the time Baughman was booked into the Jail until late 2015.  Ron Hickman, who was

appointed to succeed Garcia as Sheriff, left the office at the end of 2016.[13]  While

serving as Harris County Sheriff, Garcia and Hickman were in charge of the Jail,[14]

which is one of the largest in the United States.[15]  During the time this lawsuit has

---

[10]     *See* Original Complaint [Doc. # 1].

[11]     *See* Amended Complaint [Doc # 11]; Second Amended Complaint [Doc. # 29]; Third
Amended Complaint [Doc. # 114].

[12]     *See* Memorandum and Order dated Feb. 24, 2016 [Doc. # 110], at 4-5.

[13]     In late 2016, Ed Gonzalez succeeded Hickman as the elected Harris County Sheriff.
To date, Gonzalez has not been served or named as a defendant in this case.

[14]     *See* TEX. LOC. GOV'T CODE § 351.041(a) ("The sheriff of each county is the keeper
of the county jail.").

[15]     The Harris County Jail includes four major facilities with a design capacity of 9,800
detainees, as well as several satellite locations operated by HCSO, which increase the Jail's
available capacity overall.  *See* U.S. Dep't of Justice, Civil Rights Div., Memorandum dated
June 4, 2009 [Doc. # 190, Ex. 24], at 2. "With a population approaching 10,000 detainees,
the Jail is one of the largest detention facilities in the country."  *Id.* at 16.

been pending, the Jail's average daily population has been around 8,600 inmates.[16]

At the time Baughman was booked into the Jail, Dr. Seale was employed as the Executive Medical Director for the Jail's Health Services Division.[17]   Dr. Seale attained that position originally in 1994, when he was employed by the University of Texas Health Services Center, which was providing care to detainees at the Jail pursuant to a contractual arrangement.[18]   Dr. Seale became employed directly by HCSO in 2010, when Harris County decided to provide all medical care for the Jail "in house."[19]

During his tenure as Executive Medical Director, Dr. Seale oversaw all facets of the Health Services Division at the Jail, including medical, mental health, pharmacy, and laboratory operations.[20] The Health Services Division, which currently employs approximately 300 medical personnel,[21] operates a "general clinic" that is

---

[16]    Texas Comm'n on Jail Standards Annual Jail Reports, 2014-2016 [Doc. # 179-4], at 14, 22, 26.

[17]    Seale Aff. [Doc. # 179-3], at ¶ 2.

[18]    Seale Dep. [Doc. # 188, Ex. 2], at 14:22-16:9, 17:19-20, 18:16-24, 22:15-23.

[19]    *Id*. at 15:23-16:22.

[20]    Seale Aff. [Doc. # 179-3], at ¶¶ 2-3.

[21]    Guice Aff. [Doc. # 179-4], at ¶ 3.

open to treat inmates and provide care 24 hours a day, seven days a week.[22]   The

Health Services Division also operates several clinics that offer specialized care,

including a Dental Clinic and a Chronic Care Clinic, which provides care for chronic

diseases like hypertension, asthma, and diabetes.[23]

As Executive Medical Director, Dr. Seale was responsible for ensuring that all

components of the Health Services Division complied with criteria promulgated by

the Texas Commission on Jail Standards ("TCJS"), which has regulatory authority

over all county jails in Texas, and for ensuring that all policies and procedures in place

are consistent with applicable standards or "best practices" established by the National

Commission on Correctional Health Care ("NCCHC"), which has continually

accredited the Jail since 1985.[24]   Dr. Seale left the position of Executive Medical

Director to take a similar job elsewhere at the end of September 2015.[25]   Since that

time, Dr. Guice, who started working as a physician at the Jail in 1988, and previously

served as the Assistant Medical Director under Dr. Seale, has been serving as Interim

---

[22]     Guice Dep. [Doc. # 188, Ex. 1], at 19:10- 23:22 (describing medical infirmary, general clinic, specialty clinics, and services).

[23]     *Id*. at 21:6-23:2.

[24]     Seale Aff. [Doc. # 179-3], at ¶ 3; Guice Aff. [Doc. # 179-4], at ¶ 5.

[25]     Seale Dep. [Doc. # 188, Ex. 2], 17:19-18:24.

Executive Medical Director until a permanent replacement can be found.[26] As Interim

Director, Dr. Guice also has been responsible for overseeing and revising Jail policies

on medical care for the Health Services Division and its many operations.[27]

Sharon Lambi is a licensed physician's assistant who is in charge of the Chronic

Care Clinic during second shift.[28]   Beverly Howard is a licensed nurse practitioner

who also works in the Chronic Care Clinic.[29]   Both Lambi and Howard are considered

supervisors at the Chronic Care Clinic.[30]

The Chronic Care Clinic is charged with monitoring the blood glucose levels

of diabetic detainees on a regular basis, and ensures that detainees receive routine care

from the Optometry Clinic and the Dental Clinic for issues that commonly affect

diabetics.[31]   During the time this lawsuit has been pending, the Jail has housed

---

[26]   Guice Aff. [Doc. # 179-4], at ¶ 1; Guice Dep. [Doc. # 188, Ex. 1], at 13:20-22, 15:2-16:16, 125:19-126:8 (noting that he does not intend to stay on permanently as the Executive Director).

[27]   Guice Dep. [Doc. # 188, Ex. 1], at 144:10-20.

[28]   Lambi Aff. [Doc. # 179-5], at ¶ 6; Lambi Dep. [Doc. # 188, Ex. 3], at 17:21-18:10.

[29]   Howard Aff. [Doc. # 179-6], at ¶ 3.

[30]   Plaintiff's Response to the Individual Capacity Defendants' Motions for Summary Judgment [Doc. # 190], at 33 (alleging that, as "directors" in charge of the Chronic Care Clinic, Lambi and Howard were responsible for determining the frequency of blood glucose monitoring for diabetic inmates).

[31]   Lambi Dep. [Doc. # 188, Ex. 3], at 32:10-33:3.

8

approximately 105 to 120 diabetics who require daily insulin injections,[32] which are administered by nurses on a twice-daily basis under the direction of a treating physician at the Chronic Care Clinic.[33]

When Baughman was admitted to the Jail in April 2014, Bobby Davis was employed by HCSO as a Medical Administrator.[34] As Medical Administrator, Davis oversaw all of the clinics at the Jail.[35] Davis served in that role until August 31, 2015, when he left to work as a private contractor.[36]

Rossi is a registered dietitian who shares responsibility with other medical providers for administering inmate diets.[37] Davis was Rossi's supervisor during the time relevant to the events of this lawsuit.[38]

During the time this lawsuit has been pending, Dr. Edward Chin and Dr. Alan Harper have been the only dentists employed by HCSO at the Dental Clinic, which is

---

[32]   Guice Dep. [Doc. # 188, Ex. 1], at 41:11-42:11.

[33]   Seale Dep. [Doc. # 188, Ex. 2], at 83:4-14; *see also* Lambi Dep. [Doc. # 188, Ex. 3], at 86:3-88:21.

[34]   Davis Aff. [Doc. # 179-7], at ¶ 3.

[35]   *Id.*

[36]   *Id.*

[37]   Rossi Aff. [Doc. # 183, Ex. 3], at ¶ 2.

[38]   *Id.* at ¶ 9.

open between 6:00 a.m. and 2:00 p.m., Monday through Friday.[39]  With help from two

dental assistants, Drs. Chin and Harper provide dental care for all inmates at the Jail.[40]

Dr. Chin worked at the Jail from 2006 through late 2016, when he left to devote more

time to his private practice.[41]  Dr. Harper started working at the Jail as an "agency

employee" in 2012, and became a full-time Harris County employee in 2013.[42]

###    C.    Allegations of Inadequate Medical Care for Diabetes

Baughman's primary claim is that he has been denied adequate medical care in

the form of blood glucose monitoring for type 2 diabetes.  Type 2 diabetes is a

condition in which the pancreas does not produce enough insulin, which is the

hormone that regulates the level of glucose or sugar in the blood stream.[43]  Because

patients with type 2 diabetes can produce some insulin, they are typically treated with

a regimen that emphasizes a diet low in "sweets" along with exercise and weight loss,

but they can also require the administration of insulin, if necessary.[44]  By contrast,

persons with type 1 diabetes are incapable of producing any insulin and must depend

---

[39]    Chin Dep. [Doc. # 188, Ex. 6], at 20:13-25, 21:14-22.

[40]    *Id*. at 20:13-22, 22:9-10, 45:17-48:25.

[41]    *Id*. at 15:22-16:1.

[42]    Harper Aff. [Doc. # 183-2], at ¶ 2.

[43]    Guice Dep. [Doc. # 188, Ex. 1], at 33:4-9.

[44]    *Id*. at 48:23-49:5.

on regular insulin injections to control their blood sugar.[45]

As a result of his "severe obesity," Baughman depends on regular insulin injections to treat his type 2 diabetes.[46]  Baughman characterizes himself as an "'unstable' or 'brittle' diabetic, meaning that his blood-sugar levels are difficult to control and can vary widely over both short and long periods of time."[47]  Uncontrolled blood sugar levels in a diabetic can have serious medical consequences.  If blood sugar levels are consistently high, a diabetic patient runs the risk of developing a number of serious conditions, including heart attacks, strokes, loss of eyesight (retinopathy), loss of teeth, kidney failure, and other complications.[48]  There is also a danger of blood sugar dropping too low.[49]  If blood sugar drops too low (below 60 mg/dL or milligrams per deciliter), a diabetic could develop hypoglycemia.[50]

---

[45]     *Id*. at 34:8-22; Lambi Dep. [Doc. # 188, Ex. 3], at 56:14-24 (distinguishing type 2 and type 1 diabetes).

[46]     Expert Report of Dr. David H. Madoff ("Madoff Report") [Doc. # 190, Ex. 6], at 3 (filed under seal).

[47]     Fourth Amended Complaint [Doc. # 134], at ¶ 20.

[48]     Lambi Dep. [Doc. # 188, Ex. 3] at 57:7-22, 59:2-6; Guice Dep. [Doc. # 188, Ex. 1], at 35:4-19.

[49]     Lambi Dep. [Doc. #188, Ex. 3], at 58:7-14.

[50]     STEDMAN'S MEDICAL DICTIONARY 933 (28th ed. 2006) (noting that hypoglycemia may occur when blood glucose drops below the normal range, which is between 60 to 100 milligrams per deciliter).

Symptoms of hypoglycemia typically include sweating, trembling, feelings of warmth, anxiety, and nausea.[51] If left untreated, however, "severe hypoglycemia can cause altered mental status, confusion, coma, seizures, brain damage, and death."[52]

Baughman claims that providers at the Jail are not adequately monitoring his blood sugar levels to determine whether it is too low before giving him his twice-daily dose of insulin, placing him at risk for hypoglycemia. Although a diabetic patient can typically identify whether they have signs or symptoms of low blood sugar, glucose monitoring is considered to be the "more accurate" way to determine whether blood sugar is too low before administering insulin.[53] A glucose monitor is a portable device that can "instantaneously and accurately measure a patient's blood glucose," using the following methodology:

> To test a patient's blood sugar the patient's finger is pricked with a lancet device to express a small drop of blood. The small blood drop is then applied to a glucose test strip that has been inserted into a portable glucose monitor. The patient's blood glucose at that precise time is displayed on the glucose monitor.[54]

This procedure for testing blood sugar, which is known as the "fingerstick" technique,

---

[51] *Id*.

[52] Madoff Report [Doc. # 190, Ex. 6], at 7.

[53] Seale Dep. [Doc. # 188, Ex. 2], at 62:16-25; Guice Dep. [Doc. # 188, Ex. 1], at 67:17-19 ("Most diabetics with experience can tell you when their sugar is too low.").

[54] Madoff Report [Doc. # 190, Ex. 6], at 3.

is described as "quite simple" and reportedly takes no more than two minutes to complete by an experienced person.[55]

Medical standards of "optimal" treatment recommend that a type 2 diabetic taking insulin should have his or her blood glucose monitored at least three times a day.[56] The blood glucose levels of diabetic inmates at the Jail are monitored on a regular basis "both by venipuncture laboratory testing and by fingerstick point of care testing," but fingersticks are not administered three times a day unless this level of frequency is ordered by a medical provider.[57]  In that regard, the Chronic Care Clinic conducts quarterly testing of each diabetic detainee's hemoglobin A1c, which measures a patient's average blood glucose level over a period of seven to twelve weeks before the test.[58]  Fingerstick monitoring is done at a frequency dictated by a physician at the discretion of the treatment provider in his or her medical judgment

---

[55]    *Id.*

[56]    *See* Madoff Report [Doc. # 190, Ex. 6], at 3-4; *see also* Lambi Dep. [Doc. # 188, Ex. 3], at 73:20-76:1 (referencing standards articulated by the American Diabetes Association, the Institute for Clinical Systems Improvement, and the Federal Bureau of Prisons); Seale Dep. [Doc. # 188, Ex. 2], at 66:11-76:4 (same).

[57]    Seale Aff. [Doc. # 179-3], at ¶ 12.

[58]    *See id.*; *see also* Howard Aff. [Doc. # 179-6], ¶ 6 (summarizing the care Baughman received at the Chronic Care Clinic, including his quarterly A1c test results); Seale Dep. [Doc. # 190, Ex. 1], at 76:9-77:3, 83:4-14; Lambi Dep. [Doc. # 190, Ex. 2], at 86:3-88:21.

based on the detainee's history and observations of his condition.[59]  Diabetics with fluctuating blood glucose levels are subject to closer monitoring by the "fingerstick blood sugar/blood pressure clinic," which is operated as an adjunct to the Chronic Care Clinic.[60]  Thus, fingerstick monitoring is not automatically done every day before administering each dose of insulin unless a medical provider deems it necessary.[61]

At the time of his arrest, Baughman's treating physician reportedly had prescribed fingersticks at least four times per day.[62]  Baughman advised Jail personnel of this treatment regimen in a grievance that he submitted on April 19, 2014, complaining that he was being denied adequate fingersticks to monitor his blood glucose levels.[63]  In this lawsuit, Baughman complains that Jail medical personnel frequently administer his twice-daily injections of insulin without any knowledge of his existing blood sugar level, creating a risk of hypoglycemia followed by severe

---

[59]     Seale Aff. [Doc. # 179-3], at p. 4.

[60]     Seale Dep. [Doc. # 188, Ex. 2], at 33:8-36:11.

[61]     *See* Lambi Dep. [Doc. # 188, Ex. 3], at 75:20-76:1; Guice Dep. [Doc. # 188, Ex. 1], at 66:20-25; Seale Dep. [Doc. # 188, Ex. 2], at 74:20-75:19 (explaining that an individual practitioner is free to order more fingersticks if he or she felt it was clinically indicated).

[62]     Baughman Decl. [Doc. # 190, Ex. 8], at 1.

[63]     *Id.* at 1-2; Inmate Complaint Form [Doc. # 190, Ex 5], at 1 (Bates No. HC/Baughman 8268).

injury or even death.[64]  Citing the numerous grievances that he has filed over the past three years, Baughman contends that "all defendants" are aware that this practice poses "unnecessary and severe health risks," yet they do not automatically require checks of blood glucose levels with a fingerstick before administering each dose of insulin.[65]

Seeking relief under 42 U.S.C. § 1983, Baughman contends that Harris County's "policy" or practice of denying fingersticks before each dose of insulin, as developed, implemented, and enacted by supervisory officials at the Jail (Sheriffs Garcia and Hickman, Drs. Seale and Guice, Davis, Lambi, and Howard) is deliberately indifferent to his serious medical needs as an insulin-dependent diabetic and violates his constitutional right to adequate medical care.[66]  Baughman adds that Sheriff Garcia, Sheriff Hickman, Dr. Seale, and Dr. Guice have failed to adequately train and supervise medical personnel administering insulin at the Jail.[67]  By failing to provide medical care for diabetes in accordance with "good and accepted medical and professional practice," Baughman contends further that Harris County is liable for

---

[64]    Plaintiff's Response to the Individual Capacity Defendants' Motions [Doc. # 190], at 13.

[65]    *Id.* at 14.

[66]    Fourth Amended Complaint [Doc. # 134], at ¶¶ 40, 46, 67-68.

[67]    *Id.* at ¶¶ 78-79.

negligence.[68]

###     D.      Allegations of Inadequate Dental Care

Baughman also contends that he has been denied adequate dental care at the Jail for severe tooth decay, which has caused him to lose several teeth.  When Baughman was booked into the Jail on April 3, 2014, he reportedly had a "severe toothache" because one or more of his teeth were "broken off at the gum line" and he also had at least two painful cavities.[69]  Baughman, who had already lost numerous teeth before arriving at the Jail, was referred to the Dental Clinic for treatment pursuant to the Jail's written policy.   That policy is summarized briefly below followed by a chronology of the dental care that Baughman has received during his confinement at the Jail, which has included the extraction of multiple decayed teeth.

Jail policy states that upon intake each inmate will be given a toothbrush and toothpaste along with a copy of the Inmate Handbook, which includes instructions on

---

[68]     Fourth Amended Complaint [Doc. # 134], at ¶¶ 73-74.   Previously, the Court dismissed with prejudice state law negligence claims lodged by Baughman against former Sheriff Adrian Garcia, former Sheriff Ron Hickman, Dr. Michael Seale, Bobby Davis, Dr. Marcus Guice, Sharon Lambi, Dr. Edwin Chin, Dr. Alan Harper, Beverly Howard, Cathy Rossi, and Renee Hinojosa as precluded by an election-of-remedies provision found in § 101.106(c) of the Texas Civil Practice and Remedies Code.   *See* Memorandum and Order dated October 21, 2016 [Doc. # 160], at 6-7.   As a result, the only remaining negligence claims in this case concern Harris County.

[69]     Inmate Complaint Form [Doc. # 190, Ex. 9], at 1 (Bates No. HC/Baughman 8106).

proper brushing and flossing of teeth.[70]  Shortly thereafter, a registered nurse performs

dental screening that includes "a visual inspection of the teeth and gums, noting any

obvious or gross abnormalities requiring immediate referral to a dentist."[71]  Inmates

are given access to "the preventative benefits of fluorides in a form determined by the

dentist" at an oral examination within 12 months of admission.[72]  The oral

examination includes:   "(a) taking and reviewing the patient's oral history; (b)

extraoral, head, and neck examination; (c) charting of teeth; (d) examination of the

hard and soft tissue of the oral cavity with a mouth mirror, explorer, and adequate

illumination; and (e) the initiation of a treatment plan including appropriate follow

up."[73]  The policy states that "[r]outine oral treatment, *not limited to extractions*, is

provided according to a treatment plan based upon a system of established priorities

for care."[74]  According to the policy, "[c]onsultation through referral to oral health

care specialists is available as needed."[75]  The policy also provides that "detainees

---

[70]   HCSO Manual of Policies and Procedures for Health Services, No. J-E-06 [Doc. # 190, Ex. 28], at Bates No. HC/Baughman 5728.

[71]   *Id.*

[72]   *Id.*

[73]   *Id.* at Bates No. HC/Baughman 5728-5729.

[74]   *Id.* at Bates No. HC/Baughman 5729 (emphasis added).

[75]   *Id.*

considered to benefit from provision of dentures as determined by Harris County Sheriff's Office Dentists *will be provided* with a denture to replace the missing teeth."[76]

On May 29, 2014, Baughman was seen in the Dental Clinic by Dr. Chin, who diagnosed "residual root tips" in two teeth (#17 and #19), which were extracted with Baughman's consent.[77] An x-ray disclosed cavities in two other teeth (#18 and #20).[78] Although Dr. Chin told Baughman that the teeth could be saved with "extensive [restorative] treatment" such as a root canal,[79] the only treatment Dr. Chin offered was "extraction."[80]

On October 14, 2014, Baughman filed a grievance asking for the cavities in tooth #18 and tooth #20 to be treated with fillings, arguing that these teeth could be saved if restorative dental work were provided.[81] Baughman also requested "partial

---

[76] HCSO Manual of Policies and Procedures for Dental Services, No. 16 [Doc. # 190, Ex. 27], at Bates No. HC/Baughman 5726 (emphasis added).

[77] Plaintiff's Response to the Individual Capacity Defendants' Motions [Doc. # 190], at 14; Dental Progress Note [Doc. # 190, Ex. 12], at 1-2 (Bates No. HC/Baughman 9420) (filed under seal).

[78] Chin Dep. [Doc. # 188, Ex. 6], at 151:1-152:11, 157:13-25.

[79] *Id*. at 152:12-17, 154:12-20, 158:5-23.

[80] *Id*. at 152:21-153:4, 158:16-18.

[81] Grievance #15000 [Doc. # 190, Ex. 13], at  Bates No. HC/Baughman 8336 & 8337.

dentures" to help him chew.[82]  Baughman's requests were denied by the HCSO Inmate

Grievance Board, which advised Baughman that this type of care was not provided at

County expense, but that he had the option of having his own "freeworld dentist"

provide the requested care at the Jail.[83]

On October 23, 2014, Baughman returned to the Jail Dental Clinic and repeated

his request for fillings to treat his decaying teeth (#18 and #20).[84]  Again Baughman

was offered treatment in the form of extraction, which he again declined.[85]

On April 6, 2015, Baughman returned to the Dental Clinic for an annual dental

exam.[86]  Records of that exam reflect that Baughman was missing 13 out of 32 teeth

(#1, #2, #3, #4, #12, #13, #15, #16, #17, #19, #29, #30, and #32) and had "moderate"

periodontal disease.[87]  During this exam, Dr. Harper recommended extracting three

more teeth (#6, #18, and #31) and further recommended a root canal with a crown or,

---

[82]     *Id.*

[83]     Grievance Resolution Form - Inmate Grievance Board [Doc. # 190, Ex. 31], at Bates No. HC/Baughman 8335.

[84]     Chin Dep. [Doc. # 188, Ex. 6], at 155:12-156:10.

[85]     *Id.*

[86]     HCSO Health Services Bureau Dental: Annual and Juvenile Exam Form [Doc. # 190, Ex. 14], at 1-2 (Bates No. HC/Baughman 5917) (filed under seal).

[87]     *Id.*

alternatively, extraction for another tooth (#14).[88] An x-ray disclosed decay in another tooth (#21).[89] At that time, both tooth #20 and tooth #21 were reportedly salvageable, but Dr. Harper did not offer or recommend any treatment for those teeth.[90]

On February 19, 2016, Baughman was seen at the Dental Clinic by Dr. Harper for pain in one of his molars (#31).[91] Dr. Harper diagnosed decay and extracted the tooth after determining that it could not be saved.[92]

On March 8, 2016, Baughman returned to the Dental Clinic for pain in tooth #18, which is one of the teeth that he originally sought treatment for following his arrest in April 2014.[93] By this time, decay and "chewing pressure" had caused the "head" of tooth #18 to crumble or break off.[94] Dr. Harper extracted the remains of tooth #18.[95] X-rays taken during this visit further showed that the level of decay in

---

[88]     *Id.*

[89]     Chin Dep. [Doc. # 188, Ex. 6], at 159:16-160:24.

[90]     *Id.* at 161:15-16, 162:17-23.

[91]     Expert Report of Dr. Jay D. Shulman ("Shulman Report") [Doc. # 190, Ex. 26], at 28 (summarizing treatment provided to Baughman on February 19, 2016) (filed under seal).

[92]     *Id.* (referencing Bates No. HC/Baughman 5922).

[93]     Dental Provider Note [Doc. # 190, Ex. 15], at 3 (Bates No. HC/Baughman 5926) (filed under seal).

[94]     Chin Dep. [Doc. # 188, Ex. 6], at 168:20-169:2.

[95]     *Id.* at 167:11-168:12; 170:2.

two other teeth (#20 and #21) had progressed such that there was no treatment that could save them.[96]  It is unclear from the record whether these teeth (#20 and #21) were extracted or whether they remain in Baughman's mouth.

On April 20, 2016, Baughman was seen again in the Dental Clinic for pain in tooth #15.[97] Dr. Harper diagnosed decay and extracted the tooth after determining that it was unsalvageable.[98]

Dr. Chin admitted at his deposition that dentists at the Jail do not provide treatment for cavities, other than extraction, at County expense.[99] If a tooth looks like it can be saved with restorative treatment such as a filling or root canal, the only available option an inmate has is to hire a private dentist to treat that tooth at the Jail Dental Clinic.[100]  Baughman notes that he is indigent and maintains that this option, which requires a private dentist to bring his own staff and equipment, is "cost-prohibitive and impossible for most inmates[.]"[101]  As a result, Baughman argues that

---

[96]     Chin Dep. [Doc. # 188, Ex. 6], at 174:12-22.

[97]     Shulman Report [Doc. # 190, Ex. 26], at 29 (summarizing treatment provided to Baughman on April 20, 2016) (filed under seal).

[98]     *Id.*

[99]     Chin Dep. [Doc. #188, Ex. 6], at 41:18-42:4.

[100]    *Id.* at 41:21-42:1.

[101]    Plaintiff's Response to the Individual Capacity Defendants' Motions [Doc. # 190], at
(continued...)

the Jail effectively employs a *de facto* "extraction-only" policy "under which the only option presented to inmates is to have their teeth forcibly removed."[102]

As the result of numerous extractions both in and out of the Jail, Baughman no longer has any molar teeth, meaning that he can only chew food with his front teeth.[103] Because a person normally chews with his back teeth, Dr. Chin acknowledged at his deposition that the lack of molars places tremendous pressure on Baughman's few remaining front teeth and makes eating painful.[104]  Acknowledging further that Baughman is missing a substantial number of teeth, Dr. Chin noted that Baughman is an "extremely high candidate" for getting "complete dentures."[105]  To date, Baughman's request for partial dentures has been refused because, according to Dr. Chin, dentists at the Jail will attempt to repair an inmate's broken dentures, but will not provide new ones.[106]

---

[101](...continued)
16-17.

[102]    *Id*. at 16.  *See also* Shulman Report [Doc. # 190, Ex. 26], at 20-21 (filed under seal) (characterizing the Jail's practice of refusing to fill cavities as a "*de facto* extraction only policy").

[103]    Chin Dep. [Doc. # 188, Ex. 6], at 174:1-7.

[104]    *Id.* at 137:6-18, 144:1-17.

[105]    *Id.* at 142:16-143:10.

[106]    *Id*. at 120:8-122:10.

The defendants do not dispute that Baughman was not provided with "full-scale periodontal treatment," fillings, root canals, or crowns for tooth decay and that he was not offered dentures.[107]   Baughman contends that he was denied the care he requested at County expense pursuant to an official custom or policy that was developed, enacted, and implemented by Sheriffs Garcia and Hickman, and Drs. Seale, Guice, Chin, and Harper with deliberate indifference to his serious dental needs in violation of his constitutional right to adequate dental care.[108]   Baughman adds that Garcia, Hickman, Dr. Seale, Dr. Guice, and Dr. Chin also failed to supervise care given at the Dental Clinic or train dentists to provide adequate care.[109]   By failing to provide dental care in accordance with "good and accepted dental and professional practice," Baughman contends further that Harris County is liable for negligence.[110]

### E.      Allegations of Retaliation

Baughman alleges that he was punished after he sent a letter to the TCJS in March 2015, objecting to the inadequate medical and dental care he had received at

---

[107]      Seale Aff. [Doc. # 179-3], at ¶ 21; Guice Aff. [Doc. # 179-4], at ¶ 30.

[108]      Fourth Amended Complaint [Doc. # 134], at ¶¶ 54, 57, 59, 70-71.

[109]      *Id*. at ¶¶ 78-79.

[110]      *Id.* at ¶¶ 76-77.

the Jail.[111]  In that same letter, Baughman argued that Defendant Dr. Seale's "dual role" as head medical administrator for the Jail and a member of the TCJS was a "conflict of interest."[112]  TCJS reportedly received that letter on April 6, 2015.[113] Shortly thereafter on April 13, 2015, Baughman alleges that Davis, at the direction of Dr. Seale, ordered Rossi to impose restrictions on Baughman's commissary privileges that limited the types of food items he could purchase.[114]  Baughman contends, therefore, that Dr. Seale, Davis, and Rossi retaliated against him for exercising his constitutional right to seek redress of grievances.[115]

### F.    Defendants' Motions

Defendants Dr. Seale, Dr. Guice, Davis, Lambi, and Howard have filed a joint motion for summary judgment, arguing that they are entitled to qualified immunity from the claims lodged against them in their individual capacity as supervisory officials.[116]  In doing so, Dr. Seale, Dr. Guice, Davis, Lambi, and Howard argue that

---

[111]    *Id.* at ¶ 62.

[112]    *Id.*

[113]    *Id.* at ¶ 63.

[114]    *Id.* at ¶ 63.

[115]    *Id.* at ¶¶ 81-82.

[116]    Motion for Summary Judgment for Individual Defendants Michael Seale, M.D., Bobby Davis, R.N., Marcus Guice, M.D., Sharon Lambi, MSPAS, PA-C, [and] Beverly
(continued...)

Baughman does not have admissible evidence to prove that they personally engaged in wrongful conduct which caused a violation of Baughman's rights with the requisite subjective deliberate indifference.[117]

Defendants Dr. Chin, Dr. Harper, and Rossi have filed a separate joint motion for summary judgment, arguing that Baughman cannot show that they violated his constitutional rights and that they are also entitled to qualified immunity as a result.[118]

Harris County moves for summary judgment, arguing that Baughman fails to establish municipal liability by showing that an official custom, policy, or procedure was deliberately indifferent to his serious medical or dental needs.[119]   Harris County contends further that Baughman cannot demonstrate municipal liability based on a claim of failure to train and supervise.[120]   Finally, Harris County argues that Baughman cannot prevail on a negligence claim because his allegations do not fit

---

[116](...continued)
Howard, Ph.D., R.N., FNP-BC [Doc. # 179], at 28-49.

[117]      *Id.*

[118]      Defendants Dr. Edwin Chin, Dr. Alan Harper, and Catherine Rossi's Motion for Summary Judgment [Doc. # 183], at 11-17.

[119]      Defendant Harris County's Motion for Summary Judgment [Doc. # 181], at 24-33.

[120]      *Id.* at 33-35.

within the waiver of sovereign immunity found in the Texas Tort Claims Act.[121]

## II.   **STANDARD OF REVIEW**

The defendants move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Under this rule, a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).   An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  *Id*.

If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-movant to provide "specific facts showing the existence of a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  A reviewing court "must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment[.]"  *Smith v. Regional Trans. Auth*., 827 F.3d 412, 417 (5th Cir. 2016).  The Supreme Court has particularly emphasized the importance of drawing

---

[121]     *Id.* at 36-39.

inferences in favor of the nonmovant in cases such as this one, where individual defendants have asserted the defense of qualified immunity. *See Tolan v. Cotton*, — U.S. —, 134 S. Ct. 1861, 1866 (2014).

## III.   ANALYSIS OF LIABILITY OF THE INDIVIDUAL DEFENDANTS

Baughman seeks monetary damages from the individual defendants in their individual or personal capacity under 42 U.S.C. § 1983, which establishes "a private right of action to vindicate violations of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012) (quoting § 1983). "Under the terms of this statute, '[e]very person' who acts under the color of state law to deprive another of a constitutional right is answerable to that person in a suit for damages" *Id*. (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)). Arguing that Baughman cannot show that they violated a constitutional right, Dr. Seale, Dr. Guice, Davis, Lambi, Howard, Dr. Chin, Dr. Harper, and Rossi have moved for summary judgment on the grounds that they are entitled to qualified immunity from the claims lodged against them. Thus, Baughman's claims against these individual defendants are discussed below under the standard that governs the defense of qualified immunity.

### A.   Qualified Immunity

Public officials acting within the scope of their authority generally are shielded

from a suit for monetary damages by the doctrine of qualified immunity.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A plaintiff seeking to overcome qualified immunity must satisfy a two-prong inquiry by showing: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted).  This is an "exacting standard" that protects "all but the plainly incompetent or those who knowingly violate the law." *City and County of San Francisco v. Sheehan*, — U.S. —, 135 S. Ct. 1765, 1774 (2015) (citation omitted).

As this standard reflects, "[a] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *King v. Handorf*, 821 F.3d 650, 653-54 (5th Cir. 2016) (internal quotation marks and citations omitted).  "The plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *Id*. at 654 (quoting *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008)).  "To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.'" *Id*. (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)).

### B.     Deliberate Indifference Standard

As an initial matter, Baughman's claims that he was denied adequate medical and dental care while in Jail implicate both the Fourteenth Amendment and the Eighth Amendment to the United States Constitution.   In that respect, pretrial detainees ordinarily are protected by the Due Process Clause of the Fourteenth Amendment, which dictates that "a pretrial detainee may not be punished." *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).   Inmates who have been convicted and sentenced to imprisonment, by contrast, are protected by the Eighth Amendment, which prohibits punishment that is "cruel and unusual."   *Id*.   The Fifth Circuit has recognized that there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care.   *See Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001) (citing *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996) (en banc)).   In other words, the same legal standard governs constitutional claims concerning medical care by pretrial detainees and convicted inmates.   *See id*. Thus, precedent decided under the Eighth Amendment, which prohibits deliberate indifference to an inmate's serious medical needs, governs Baughman's claims that he was denied adequate medical and dental care.[122]

---

[122]     Although he is technically a detainee awaiting trial, Baughman acknowledges that he is a previously convicted felon who was on parole at the time of his arrest.   *See* Fourth

(continued...)

A prison official's "deliberate indifference to serious medical needs of prisoners" can constitute "unnecessary and wanton infliction of pain" of the type proscribed by the Eighth Amendment and actionable under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"). A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required. *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006) (citation omitted). In this context, it is "obduracy and wantonness, not inadvertence or error in good faith," that characterizes the conduct

---

[122](...continued)

Amended Complaint [Doc. # 134], at ¶ 16. In his response to the summary judgment motions, Baughman does not seek relief under the legal standard that applies to pretrial detainees under the Fourteenth Amendment. *See* Plaintiff's Response to Harris County's Motion for Summary Judgment [Doc. # 188], at 18, n.4 (citing *Presley v. Sanders*, Civ. A. No. 1:14cv130, 2016 WL 6651375, at *2 (S.D. Miss. Nov. 10, 2016)). He therefore has abandoned this theory of recovery, and the Court does not address whether Baughman's claims concern "episodic acts or omissions" or "conditions of confinement," which is a distinction developed by the Fifth Circuit in *Hare v. City of Corinth, Mississippi*, 74 F.3d 633, 644-45 (5th Cir. 1996) (en banc), for purposes of determining whether a due process violation occurred. *See Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 462 (5th Cir. 2015) (noting that, "post-*Hare*, constitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission'") (quoting *Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009) (citation omitted)).

prohibited by the Eighth Amendment, "whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  "Thus, the prison official's state of mind must be examined to determine whether the undue hardship endured by the prisoner was a result of the prison official's deliberate indifference." *Bradley*, 157 F.3d at 125 (citing *Wilson v. Seiter*, 501 U.S. 294 (1991)).

The deliberate indifference standard has both an objective and subjective component.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To establish deliberate indifference under this standard, the prisoner must show that the defendants were both (1) aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that they actually drew an inference that such potential for harm existed.  *See Farmer*, 511 U.S. at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).  Under the subjective prong of this analysis, a prison official acts with deliberate indifference "only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it."  *Gobert*, 463 F.3d at 346 (quoting *Farmer*, 511 U.S. at 847).

The deliberate indifference standard is an "extremely high" one to meet.

*Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  It is well established that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (citing *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991); *Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir. 1999); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999)). "Furthermore, the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Gobert*, 463 F.3d at 346 (citing *Domino*, 239 F.3d at 756 (quoting *Estelle*, 429 U.S. at 107)).  "A showing of deliberate indifference requires the prisoner to submit evidence that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Gobert*, 463 F.3d at 346 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

### C.     Claims of Inadequate Blood Glucose Monitoring for Diabetes

Baughman notes that the Jail has no written policy that governs the frequency of blood glucose monitoring or that requires fingerstick testing before each dose of insulin, which Baughman believes is necessary to avert potentially serious

consequences (*i.e.*, hypoglycemia) for a diabetic whose blood sugar happens to be dangerously low when the dose is administered.  Baughman contends, therefore, that Dr. Seale, Dr. Guice, Davis, Lambi, and Howard have failed to adopt polices and procedures necessary to protect inmates with diabetes and that they have also failed to adequately supervise and train "directors, administrators and staff" on how frequently to conduct fingerstick testing despite the fact that damage to Baughman was a "highly predictable consequence" of their failure to do so.[123]

Arguing that Baughman has not established that he was denied adequate care for diabetes with the requisite deliberate indifference, Dr. Seale, Dr. Guice, Davis, Lambi, and Howard argue collectively that they are entitled to summary judgment on the defense of qualified immunity because Baughman cannot demonstrate that they are liable under 42 U.S.C. § 1983 as supervisory officials.  A supervisory official is not liable under § 1983 for the actions of subordinates "on any theory of vicarious liability."  *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (citations omitted). "Rather, a plaintiff must show either the supervisor personally was involved in the constitutional violation or that there is a 'sufficient causal connection' between the supervisor's conduct and the constitutional violation."  *Evett v. Deep East Tex.*

---

[123]     Fourth Amended Complaint [Doc. # 134], at ¶¶ 66-68, 79; *see also* Plaintiff's Response to the Individual Capacity Defendants' Motions for Summary Judgment [Doc. # 190], at 33.

*Narcotics Trafficking Task Force*, 330 F.3d 681, 689 (5th Cir. 2003) (quoting *Thompkins*, 828 F.2d at 304); *see also Southard v. Texas Bd. of Crim. Justice*, 114 F.3d 539, 550 (5th Cir. 1997) ("[T]he misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor."). Thus, "[a] supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (internal quotation marks and citation omitted).

Baughman does not allege that Dr. Seale, Dr. Guice, Davis, Lambi, or Howard personally participated in a constitutional deprivation.[124] Instead, he claims that they are liable for failing to implement an adequate policy that requires fingersticks three

---

[124]    The record reflects that Lambi treated Baughman in the Chronic Care Clinic on a total of three occasions:  June 26, 2014; July 29, 2014; and June 29, 2016.  *See* Lambi Aff. [Doc. # 179-5], at ¶¶ 7-9.  Howard personally treated Baughman in the Chronic Care Clinic on ten occasions, including: April 22, 2014; September 22, 2014; October 22, 2014; January 22, 2015; April 28, 2015; July 28, 2015; October 30, 2015; November 16, 2015; February 15, 2016; and October 11, 2016.  *See* Howard Aff. [Doc. # 179-6], at ¶ 6.  Baughman does not specifically allege or point to any admissible evidence showing that Lambi or Howard personally denied him a fingerstick or any other type of treatment on these occasions. Baughman does not otherwise demonstrate that he was denied care with deliberate indifference in connection with any treatment that Lambi and Howard personally provided. Likewise, Baughman does not allege or show that Dr. Seale, Dr. Guice, or Davis personally provided him with medical care or that they were otherwise directly involved in any blood glucose monitoring that was conducted by medical providers under their supervision.

times per day for diabetic detainees and that the practice currently in place at the Jail is constitutionally deficient. To be liable based on a policy or practice, the supervisory employee must "implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation"; or he must know that the system was so deficient as to be unconstitutional and "failed to properly attempt to correct [it]" and his inaction must cause the plaintiff's injuries. *Thompkins*, 828 F.2d at 304.  Moreover, to establish liability in this context, a plaintiff must show that the supervisory official acted or failed to act with deliberate indifference to constitutional violations committed by their subordinates.  *See Porter*, 659 F.3d at 446 (citation omitted).  "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."  *Id*. (internal quotation marks and citation omitted).

Also, where, as here, a plaintiff asserts liability based on a failure to train or supervise, he must show that "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."  *Id*. (quoting *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009)); *see also Estate of Davis v. City of North Richland Hills*, 406

35

F.3d 375, 381 (5th Cir. 2005) (citations omitted).

Baughman falls short of the showing required to impose supervisory liability where his medical care for diabetes is concerned.  In support of his claim, Baughman simply notes that medical standards of care recommended by the American Diabetes Association ("ADA") and the Federal Bureau of Prisons call for testing blood glucose levels *up to* three times daily.[125]  The defendants do not dispute that Jail policy does not require fingersticks up to three times a day on a daily basis as recommended by medical standards, but instead contend that the medical standards and Jail policy leave decisions about the frequency of blood glucose monitoring up to the individual treatment provider in his or her clinical judgment.[126]  As outlined above, diabetic detainees are treated and monitored regularly by the Chronic Care Clinic.  Nurses working under the direction of a treating physician go to the housing units to administer insulin to diabetic detainees "on a twice daily basis" in the morning and evening.[127]  A nurse may decide based on an inmate's appearance or symptoms that it is not in the inmate's best interest to receive a dose of insulin and may contact a

---

[125]    *See* Madoff Report [Doc. # 190, Ex. 6], at 3; Seale Dep. [Doc. # 188, Ex. 2], at 66:13-75:3 (discussing standards).

[126]    Guice Dep. [Doc. # 188, Ex. 1], at 122:16-124:5; Seale Dep. [Doc. # 188, Ex. 2], at 76:9-77:3.

[127]    Seale Dep. [Doc. # 188, Ex. 2], at 83:4-14; *see also* Lambi Dep. [Doc. # 188, Ex. 3], at 86:3-88:21.

physician if an adjustment to the detainee's treatment plan is indicated.[128]   A diabetic inmate may request a fingerstick at any time if he suspects that his blood sugar is low.[129]   It is undisputed that Baughman was given a fingerstick at his request on all but one occasion.[130]

There are more than 2,000 pages of medical records in this case, confirming that Baughman has received extensive care and monitoring throughout his current incarceration both at the Jail and by specialists outside the Jail.[131]   "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193-95 (5th Cir. 1993)).   These records show that, of the fingerstick testing that was done on 267 occasions between April 3, 2014, and September 30, 2016, Baughman's blood glucose levels were consistently within what is considered a normal range or higher.[132]   Baughman does

---

[128]     Seale Dep. [Doc. # 188, Ex. 2], at 84:9-85:1.

[129]     *Id*. at 89:23-90:3.

[130]     Affidavit of Susan Morrey Morris, M.D. [Doc. # 181-8], at ¶ 8.

[131]     *See* Medical Records [Doc. # 182] (under seal); Seale Aff. [Doc. # 181-3], ¶ 4 (summarizing care between April 3, 2014, through September 4, 2015); Howard Aff. [Doc. # 179, Ex. 5], at 6-11 (summarizing treatment provided in the Chronic Care Clinic and by outside providers between 2014 and 2016, including results of Baughman's A1c tests).

[132]     Blood Glucose for Steven Baughman [Doc. # 190, Ex. 23] at Bates No.
(continued...)

not point to any evidence showing that he has suffered complications as the result of receiving a dose of insulin while his blood sugar was too low or that he suffered any harm as a result of the alleged failure to adopt a specific fingerstick policy. The Court's own review of the voluminous medical records does not disclose evidence showing that Baughman suffered any adverse effect as the result of not receiving a fingerstick.

Viewing all of the evidence in the light most favorable to Baughman as the non-movant, he does not establish that the practice of providing fingersticks at the discretion of Jail medical providers has resulted in a denial of care with wanton disregard for a serious medical need. Even assuming that the existing policy or practice falls below the standard of care that is considered optimal, it is well established that neither allegations of malpractice nor disagreement with the level of care provided rise to the level of deliberate indifference that is actionable under 42 U.S.C. § 1983. *See Gobert*, 463 F.3d at 346; *Hall*, 190 F.3d at 697; *Stewart*, 174 F.3d at 537; *Banuelos*, 41 F.3d at 235; *Varnado*, 920 F.2d at 321. Baughman does not otherwise demonstrate that he has suffered any harm as a result of the level of care he has been provided for his diabetes or that reasonable officials in the defendants'

---

[132](...continued)
HC/Baughman 7936-7942 (filed under seal).

positions would have realized that their conduct as supervisory officials was objectively unreasonable in light of clearly established law that prohibits deliberate indifference to a detainee's serious medical needs where blood-glucose monitoring is concerned.

Likewise, for the foregoing reasons, Baughman does not demonstrate that his constitutional rights were violated due to any failure to train or supervise the nurses who administer insulin at the Jail.  Absent a genuine issue of material fact, Dr. Seale, Dr. Guice, Davis, Lambi, and Howard are entitled to qualified immunity on the claims against them regarding the adequacy of care for his diabetes.  Accordingly, the motion for summary judgment filed by these individual defendants will be granted with respect to this claim.

### D.    Denial of Adequate Dental Care

As outlined above, Baughman requested fillings for tooth decay and partial dentures, but alleges that his requests were refused and he was told that he had to hire a private dentist to provide care at the Jail if he wanted this type of treatment. Arguing that he is indigent and unable to afford the services of a private dentist, Baughman contends that this "policy" of refusing to provide restorative treatment at County expense for tooth decay has caused him to lose several teeth that could have been saved and that, without dentures, he has been put at risk of losing more teeth and

subjected to "preventable pain."[133]  Baughman claims, therefore, that Drs. Seale, Guice, Chin, and Harper have violated his constitutional right to adequate dental care.

Drs. Seale, Guice, Chin, and Harper do not dispute that Baughman was not offered restorative treatment or dentures.  These defendants maintain, nevertheless, that the treatment options offered to him (extraction of his decaying teeth or care provided by a private dentist at his expense) were not unreasonable in light of clearly established law.  For this reason, Drs. Seale, Guice, Chin, and Harper maintain that they are entitled to qualified immunity.

For purposes of qualified immunity, "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, — U.S. —, 136 S. Ct. 305, 308 (2015) (per curiam) (citation and internal quotation marks omitted).  While there need not be a case "directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  Thus, a clearly established right may not be defined "at a high level of generality." *Mullenix*, 136 S. Ct. at 308 (citing *al-Kidd*, 563 U.S. at 742).  Rather, a clearly established right must be "'particularized'

---

[133]    Plaintiff's Response to the Individual Defendants' Motions for Summary Judgment [Doc. # 190], at 35.

to the facts of the case." *White v. Pauly*, — U.S. —, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (explaining that a clearly established right "must derive from 'controlling authority – or a robust consensus of persuasive authority – that defines the contours of the right in question with a high degree of particularity' at the time of [the] challenged conduct").

This case concerns an indigent inmate who requested dental care, specifically, fillings for his decayed teeth and partial dentures to replace missing teeth, but was denied such care at County expense. The Court considers separately whether Baughman had a clearly established right to restorative treatment for tooth decay and for dentures and, if so, whether he was denied that right by dental providers (Drs. Chin and Dr. Harper) and by the supervisory officials (Drs. Seale and Guice).

## 1.    A Detainee's Right to Dental Care for Tooth Decay

Courts have recognized that "[p]risoners generally have more extensive dental problems that the average citizen." *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980); *Mounce v. Doe*, Civ. No. 12-669, 2014 WL 2587698, at *12 (E.D. La. 2014) (summarizing testimony from a dentist, who observed that inmates frequently come into a county jail with "terrible, terrible, terrible teeth" because they do not otherwise get regular dental care). It is undisputed that tooth decay, if left untreated, is

progressive and can result in extreme pain, loss of tooth structure, and ultimately loss of the affected tooth.[134]   Thus, courts have recognized that access to dental care in prison is an "important medical need" for conditions that cause pain, discomfort, or otherwise pose a threat to an inmate's health. *Ramos*, 639 F.2d at 576; *see also, e.g., Hartsfield v. Colburn*, 491 F.3d 394, 397 (8th Cir. 2007) ("Toothaches can be excruciatingly painful, and dental care is an important part of proper health care [in the prison environment]."); *Jones v. Coughlin*, 623 F. Supp. 392, 404 (S.D.N.Y. 1985) (concluding that where pain and discomfort are alleged "restorative services" such as filling cavities, doing root canal work, and crowning broken teeth are "serious medical needs as the law defines that term").

It is beyond dispute that the government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).   A prison official's failure to provide medical care with deliberate indifference to a prisoner's serious medical needs can constitute "unnecessary and wanton infliction of pain," which is prohibited by the Eighth Amendment. *Id.* at 104 (citation omitted).  Although a non-indigent prisoner may be expected to pay for some

---

[134]    *See* Shulman Report [Doc. # 190, Ex. 26], at 10 (filed under seal) (explaining that tooth decay, "especially once the enamel is penetrated, generally progresses consistently, and the more time that passes before the tooth is treated (*i.e.*, filled), the greater the likelihood that decay will progress, destroying tooth structure, possibly causing an abscess, and generally requiring the tooth to be extracted").

or all of his medical expenses,[135] if he has the means to do so, it is clearly established that "[p]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier and less efficacious treatment' of the inmate's condition' . . . [, n]or may they condition provision of needed medical services on the inmate's ability or willingness to pay."  *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citation and internal quotation omitted); *see also Weeks v. Hodges*, 871 F. Supp. 2d 811, 821-22 (N.D. Ind. 2012) (observing in a case about dental care that prison officials may not condition medical treatment on a prisoner's ability to pay) (citing *Martin v. Debruyn*, 880 F. Supp. 610, 615 (N.D. Ind. 1995) ("A prison official who withholds necessary medical care, for want of payment, from an inmate who could not pay would violate the inmate's constitutional rights if the inmate's medical needs were serious . . . ."); *Cannon v. Mason*, 340 F. App'x 495, 499 n.3 (10th Cir. 2009) ("[A]n Eighth Amendment violation concerning medical charges only occurs if prison officials deny an inmate medical treatment due to a lack of funds or condition the provision of needed medical services upon an inmate's ability to pay . . . .") (citations omitted)).  Simply put, "[i]f the prisoner

---

[135]    *See Morris v. Livingston*, 739 F.3d 740, 746-47 (5th Cir. 2014) (upholding TDCJ's authority to assess a $100 annual health care fee); *see also Myers v. Klevenhagen*, 97 F.3d 91 (5th Cir. 1996) (upholding the Harris County Sheriff's policy of charging non-indigent prisoners for medical services).

cannot pay, he must be maintained at state expense; it cannot deny minimal medical care to poor inmates." *Bihms v. Klevenhagen*, 928 F. Supp. 717, 718 (S.D. Tex. 1996) (citing *Estelle*).

The defendants do not address this authority. Instead, they emphasize that access to dental care in the Jail setting differs from what is available in the community because "[j]ail settings are typically short term environments."[136] As such, routine preventive care and cleanings are not provided because dentists at the Jail "are there for more acute dental needs."[137] In that regard, the dentists primarily provide "emergent dental care," which typically involves treating a tooth that is causing pain.[138] According to Dr. Chin, most of the inmates who request care at the Jail Dental Clinic need to have a painful tooth removed.[139] Dr. Chin acknowledges that extraction is the only option provided for cavities if an inmate cannot pay for care by a private dentist.[140] Baughman characterizes this as an "extraction-only policy" and argues that

---

[136]     Seale Dep. [Doc. # 188, Ex. 2], at 124:10-20.

[137]     *Id.*

[138]     Chin Dep. [Doc. # 188, Ex. 6], at 17:1-14.

[139]     *Id*. at 18:15-17.

[140]     *Id.* at 74:18-75-5, 76:1-77:5.

it is unconstitutional.[141]

There is authority for the proposition that a policy of denying treatment for painful dental conditions "unless the inmate is willing to submit to extraction of a tooth at county expense, or has the resources to employ a local dentist for an emergency filling[,] . . . violates the requirement that reasonably adequate medical care be supplied to persons in custody." *Heitman v. Gabriel*, 524 F. Supp. 622, 627 (W.D. Mo. 1981); *see also Stack v. McCotter*, 79 F. App'x 383 (10th Cir. 2003) (holding that summary judgment was inappropriate where an inmate was denied care under a prison policy which explicitly stated, "[*d*]*o not* ask to go to the dentist unless you are willing to have your tooth pulled") (emphasis in original); *Beamon v. Parkland Hosp.*, Civ. No. 3:08-0693, 2008 WL 4061417, at *3 (N.D. Tex. Aug. 20, 2008) (concluding without reaching the merits that an inmate who alleged that he was refused treatment other than extraction stated a claim under the Eighth Amendment standard); *Mitchell v. Liberty*, Civ. No. 8-341-B-W, 2009 WL 33435, *4 (D. Me. Jan. 5, 2009) (concluding that a detainee articulated a possible constitutional violation in connection with a county-wide policy of denying dental care other than emergency extractions). In that respect, offering extraction only as treatment for tooth decay may be unconstitutional depending on the facts of the case. *See Chance v. Armstrong*, 143

---

[141]    *See* Shulman Report [Doc. # 190, Ex. 26], at 20-21 (filed under seal).

F.3d 698, 703-04 (2d Cir. 1998) (recognizing that a dentist's decision to recommend extraction rather than fillings could be the product of sound medical judgment, but it could be deliberate indifference if the dentist had a monetary incentive or other ulterior motive); *see also Harrison v. Barkley*, 219 F.3d 132, 137-39 (2d Cir. 2000) (overturning summary judgment on qualified immunity for a prison dentist who left a cavity unfilled for one year because the inmate would not consent to extraction of an adjacent tooth); *Pipes v. North Dakota*, Civ. No. 1:07-00067, 2007 WL 4661655, *8-9 (D.N.D. Dec. 10, 2007) (suggesting that an extraction-only policy may give rise to an Eighth Amendment violation in certain circumstances unless evidence makes clear that extraction is a "medically preferred treatment"). Thus, it appears clearly established that offering extraction only instead of a filling for tooth decay can violate the Eighth Amendment if extraction is not medically necessary at that time. *See Chance*, 143 F.3d at 703-04.

Baughman has presented evidence showing that he arrived at the Jail with a broken, decaying, and missing teeth, and that he was denied restorative dental care in the form of fillings by Drs. Chin and Harper,[142] which subjected Baughman to "pain

---

[142]      Chin Dep. [Doc. # 188, Ex. 6], at 152:12-17, 153:9-10; HCSO Health Services Bureau Dental:   Annual and Juvenile Exam Form [Doc. # 190, Ex. 14], at 1-2 (Bates No. HC/Baughman 5917) (filed under seal).

and loss of tooth structure,"[143] because he could not pay for the care that he needed. In that respect, Baughman has raised a genuine fact issue regarding whether he was denied necessary dental care because of the Jail dentists' practice of limiting treatment for cavities to extractions unless the inmate could afford to hire a private dentist.[144] Assuming Baughman can establish that he was indigent,[145] there is a genuine issue of material fact whether Drs. Chin and Harper denied him dental care, because of an inability to pay, by refusing him fillings for advanced tooth decay, which was a serious medical need.

The Court's ruling here is narrow.  The Court addresses only whether Baughman was denied dental care in the form of standard fillings to repair one or more of his decayed teeth.  It is undisputed that Baughman arrived at the Jail with multiple teeth in various states of decay and he had already had more than ten teeth

---

[143]     Shulman Report [Doc. # 190, Ex. 26], at 31, 35.

[144]     *See* Seale Dep. [Doc. # 188, Ex. 2], at 134:16-135:17, 150:18-23 (attributing to the dentists the practice of providing extractions only for indigent inmates with cavities); *see also* Chin Dep. [Doc. # 188, Ex. 6], at 35:5-8 (describing how he learned of the practice).

[145]     There is evidence in the record that may call into question whether Baughman was indigent.  The medical records reflect that Baughman threatened to sue, claiming that the dental care being offered was "unconstitutional" and that he had received a $27,000.00 settlement from prison officials in Oklahoma for this same issue.  *See* Seale Aff. [Doc. # 179-3], at ¶ 33.  If an inmate is not indigent, prison officials can require him to pay for some or all of his medical and dental treatment.  *See Morris*, 739 F.3d at 747 (citations omitted); *see also Poole v. Isaacs*, 703 F.3d 1024, 1026 (7th Cir. 2012) (observing that "the Eighth Amendment does not compel prison administrators to provide cost-free medical services to inmates who are able to contribute to the cost of their care").

extracted before he was arrested in 2014.  There is conflicting evidence about whether standard fillings would have resolved Baughman's pain and prevented further decay where only two of his teeth are concerned (teeth #18 and #20).[146]   Although Baughman has presented enough evidence to survive summary judgment on this limited issue, it is not clear that he can prevail.[147]  *See Greywind v. Podrebarac*, Civ. No. 1:10-006, 2011 WL 4750962, *8 n.6 (D.N.D. Sept. 12, 2011) ("[G]iven the weight of existing authority, any prisoner claim for better dental care than what can be afforded by the poor and working poor in this country would face an uphill battle."); *see also Rumierz v. Sheriff*, Civ. No. 02-6146, 2006 WL 3068577 (D.N.J. Oct. 27, 2006) (noting that an extraction-only policy "has been deemed constitutionally offensive," but that "if defendants can establish that extraction was the appropriate medical decision given the condition of [plaintiff's] teeth at the time

---

[146]    *See* Chin Dep. [Doc. # 188, Ex. 6], at 152:4-153:10 (noting that tooth #18 was not "a fillable tooth"); *see also* Shulman Report [Doc. # 190, Ex. 26], at 24, n.44 (noting that tooth #18, which was indicated for extraction by Dr. Chin on May 29, 2014, had "deep decay" and may have been unsalvageable) and 31 (noting that tooth #20 could have been treated with a "conservative filling" on May 29, 2014, but decay was allowed to spread).

[147]    Although Baughman argues that extractions are not "treatment," [Doc # 190], at p. 37, in reality it is course of treatment resorted to by many who are unable to afford more expensive alternatives. *See* Mary Jordan and Kevin Sullivan, *The Painful Truth About Teeth*, WASH. POST, May 13, 2017 (noting that millions of working poor Americans rely on charity clinics and hospital emergency rooms to treat painful and neglected teeth, many opting simply to have them pulled because they are unable to afford expensive root canals and crowns).

of treatment, the legal implications of an extraction-only policy become less clear").

To the extent that Baughman contends that Drs. Chin and Harper failed to diagnose decay before it advanced beyond the point of salvageability with a standard filling, his claim sounds only in common law negligence or dental malpractice, and does not constitute deliberate indifference or state a claim under the Eighth Amendment. *See Estelle*, 429 U.S. at 105 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *see also Stewart* ("[A]lthough inadequate medical care may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not.").

Likewise, to the extent that Drs. Chin and Harper recommended other more extensive treatment such as a root canal with a crown, the exercise of medical judgment in making that recommendation is not actionable under the Eighth Amendment. *See Estelle*, 429 U.S. at 107 (explaining that the decision whether to provide a particular type of treatment "is a classic example of a matter for medical judgment"). In that respect, it is well established that disagreement with or differences of opinion about treatment options provided do not rise to the level of deliberate indifference and do not demonstrate a constitutional violation. *See Gobert*, 463 F.3d at 346 (citations omitted); *see also Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir.

1997).

It is also well established that an inmate has no constitutional right to have the treatment he prefers or the best medical treatment available. *See Estelle*, 429 U.S. at 105-06; *see also Ruiz v. Estelle*, 679 F.2d 1115, 1149 (5th Cir. 1982) ("The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves, nor the therapy that Medicare and Medicaid provide for the aged or the needy."). Prison officials are not required to provide treatment that is "the best that money could buy[.]" *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992); *McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978). As Baughman's dental expert concedes, root canals are "generally not performed in a correctional environment."[148]  Thus, offering extraction in lieu of a root canal or other more expensive treatment for tooth decay does not violate the Eighth Amendment if extraction is medically appropriate and will resolve the issue. *See McQueen v. Karr*, 54 F. App'x 406, 2002 WL 31688891 (5th Cir. 2002) (per curiam) (rejecting an Eighth Amendment challenge by an inmate who declined extraction because he wanted "more expensive restorative treatment"); *see also James v. Penn. Dep't of Corr.*, 230 F. App'x 195, 196-98, 2007 WL 131730, at *1-2 (3d Cir. 2007) (per curiam) (concluding that there was no Eighth Amendment claim stemming from

---

[148]     Shulman Report [Doc # 190, Ex. 26], at 14.

an extraction where prison policy did not permit root canals); *Mathews v. Raemisch*, 513 F. App'x 605, 607-08 (7th Cir. 2003) (offering extraction, rather than a root canal, does not demonstrate deliberate indifference); *Willis v. Washington*, 172 F.3d 54, 1999 WL 14307, at *2 (7th Cir. 1999) (unpublished) (rejecting an Eighth Amendment claim from an inmate who was told "he either could live with the pain or have his teeth pulled," and who alleged that he "should have been offered alternatives to extraction"); *Greywind v. Podrebarac*, Civ. No. 1:10-006, 2011 WL 4750962, *8 (D.N.D. Sept. 12, 2011) (concluding that "there is no 'clearly established' right on the part of prisoners to dental treatment in the form of crowns and implants in lieu of extraction, particularly when the latter appropriately resolves the underlying problem and does not compromise the prisoner's health"); *Bain v. Hsu*, Civ. No. 1:06-189, 2010 WL 3927589, *4-5 (D. Vt. 2010) (noting that other courts have found that extraction is a constitutionally valid treatment absent evidence that it is an unnecessary course of treatment for a broken and decayed tooth) (citations omitted); *Brathwaite v. Corr. Med. Servs.*, 630 F. Supp. 2d 413, 417 (D. Del. 2009) (concluding that there was no Eighth Amendment violation where a prisoner was offered extraction only and denied the root canal that he requested); *Campbell v. St. Clair Cty. Jail*, Civ. No. 2:08-10224, 2008 WL 186376 (E.D. Mich. Jan. 22, 2008) (concluding that a decision by jail officials to extract an inmate's tooth, rather than perform a root

canal to save the tooth, does not evince deliberate indifference); *Wilkens v. Ward*, Civ. No. 05-254, 2007 WL 2407082, at *6-7 (W.D. Okla. Aug. 22, 2007) (rejecting a prisoner's claim based on defendants' failure to provide her with root canal therapy rather than extraction); *Ball v. Johnson Cty. Jail*, Civ. No. 3:03-3056, 2004 WL 2338105, at *1-2 (N.D. Tex. Oct. 18, 2004) (concluding that an inmate's allegation that he should have been provided an alternative treatment to extraction for an infected tooth did not state an Eighth Amendment claim); *Del Muro v. Federal Bureau of Prisons*, Civ. No. 5:03-214, 2004 WL 1542216, at *3-4 (N.D. Tex. July 8, 2004) (finding no Eighth Amendment violation where the prisoner was offered extraction only pursuant to prison policy and not the crowns or a bridge that he wanted); *Hogan v. Russ*, 890 F. Supp. 146, 149 (N.D.N.Y. 1995) (offering extraction, but refusing to provide specialized dental care by a periodontist at state expense pursuant to prison policy, did not establish deliberate indifference);   *Kopera v. Cook Cty. Bd. of Comm'rs*, Civ.  No. 93-3934, 1994 WL 577238, at * 5 (N.D. Ill. Oct. 18, 1994) (rejecting a Cook County jail inmate's constitutional challenge to a policy that offered extraction only for complaints of dental pain).

In this case, however, there are unresolved fact issues about whether Baughman's decayed teeth were beyond saving with a standard filling such that extraction could be considered appropriate treatment.  *See Chance*, 143 F.3d at 703-

04.   For this reason, Drs. Chin and Harper are not entitled to summary judgment on the issue of qualified immunity from liability for Baughman's claim that he was denied adequate dental care for tooth decay.

### 2.   A Detainee's Right to Dentures

Baughman also claims that he was denied partial dentures to address serious chewing difficulties.  The Fifth Circuit has repeatedly held that an inmate alleging that he suffers from difficulty eating, severe pain, and disfigurement, among other symptoms, may have a serious medical need for dentures.  *See Huffman v. Linthicum*, 265 F. App'x 162 (5th Cir. 2008) (allegations of intense physical pain, swollen gums, weight loss, disfigurement, and stomach pain due to the failure to provide dentures is sufficient to articulate a serious medical need for dentures); *Vasquez v. Dretke*, 226 F. App'x 338, 340 (5th Cir. 2007) (allegations of difficulty eating, headaches, disfigurement, severe pain, and bloody stool are sufficient to demonstrate a serious medical need for dentures under the Eighth Amendment); *Williams v. Mason*, 210 F. App'x 389, 390 (5th Cir. 2006) (concluding that a prisoner may have a serious medical need for dentures after he complained he suffered cuts and bleeding, difficulty chewing, digestive difficulties and was denied dentures and a soft diet); *Green v. Hendrick Medical Center*, 251 F.3d 157 (5th Cir. 2001) (unpublished) (concluding that an inmate alleging denial of new dentures and refusal to treat lacerated, swollen

gums caused by loose fitting dentures stated a claim under the Eighth Amendment).

Other courts also have recognized that lack of dentures, or delay in providing them,

can rise to the level of a serious medical need that is actionable under the Eighth

Amendment. *See, e.g.*, *Farrow v. West*, 320 F.3d 1235 (11th Cir. 2003) (finding that

summary judgment was improper where a 15-month delay in providing dentures

caused pain, bleeding, swollen gums, and periodic weight loss, which raised a fact

issue about whether the dentist displayed deliberate indifference to a serious medical

need); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (per curiam)

(concluding that an inmate's allegations of an inability to chew, bleeding, headaches,

and disfigurement are sufficient to demonstrate a serious medical need for dentures);

*Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (reversing summary

judgment for defendants where prisoner alleged that lack of dentures caused bleeding

gums, breaking teeth, and pain due to an inability to eat properly).  Based on this

precedent, it is clearly established that prison officials can act with deliberate

indifference by denying an inmate's serious medical need for dentures.[149]  *See*

---

[149]     It is noted that typically it is a prisoner's "pain and weight loss from having virtually no teeth" that constitutes a serious medical need for dentures.  *See Farrow*, 320 F.3d at 1244. The defendants argue that Baughman cannot demonstrate deliberate indifference to a serious medical need because he has gained 50 pounds since he entered the Jail, going from 375 pounds at the time of intake in April 2014, to more than 425 pounds in August 2015, showing that Baughman does not have difficulty eating without dentures.  There is conflicting evidence from Baughman's dental expert, Dr. Jay Shulman, who notes that "chewing

(continued...)

*Campbell v. Dunham*, No. 07-00567, 2010 WL 7361158, at *4-5 (S.D. Iowa Oct. 27, 2010) (collecting cases on the denial of dentures as deliberate indifference).

Turning to the record in this case, Dr. Chin testified at his deposition that he considers Baughman a strong candidate for full or "complete dentures,"[150] which would necessarily require the removal of all of Baughman's remaining teeth. Baughman, however, has not indicated that he wants a full set of dentures. In his grievances, Baughman requested partial dentures only.[151] Dr. Chin testified that Baughman would not have been a candidate for partial dentures, assuming that this option were available at the Jail, because of the unstable nature of Baughman's

---

[149](...continued)

difficulty can actually cause an individual to *gain* weight." Shulman Report [Doc. # 190, Ex. 26], at 8 (emphasis in original). Dr. Shulman explains that, in some cases, people suffering from "compromised dental status" avoid foods that are hard to chew, choosing instead processed foods that are high in carbohydrates, thus leading to weight gain. *Id.* at 8-9. Under these circumstances, Baughman's weight gain is not dispositive of whether he was denied care with deliberate indifference to a serious medical need in a manner that was objectively unreasonable under the circumstances. *See Vasquez*, 226 F. App'x at 40 (indicating that dentures may not be denied solely on the grounds that an inmate has not lost weight because it is still possible to demonstrate that providers knew of, but disregarded, a serious medical need). *But see Perkins v. TDCJ*, 514 F. App'x 488, 489 (5th Cir. 2013) (finding no deliberate indifference for delay in providing dentures where the inmate did not lose weight for three years after having his teeth pulled). Nevertheless, for the reasons set forth hereafter, the dispute about Baughman's weight is not material or sufficient to require a trial on the issue of whether he was denied dentures improperly.

[150]    Chin Dep. [Doc. # 188, Ex. 6] at 142:16-143:10.

[151]    Grievance #15000 [Doc. # 190, Ex. 13], at Bates No. HC/Baughman 8336-8337.

remaining teeth and gums.[152]  Baughman does not present evidence showing that partial dentures are a suitable option for him.  Nor has he established that he sought and was denied a full set of dentures.  Under these circumstances, Baughman has failed to show that he was denied dentures with deliberate indifference in violation of a clearly established right.  Accordingly, Drs. Chin and Harper are entitled to qualified immunity from Baughman's claim that he was wrongfully denied partial dentures. The defendants' motion for summary judgment on this issue will be granted.

### 3.    Supervisory Liability

Baughman alleges that Drs. Seale and Guice are liable in their supervisory capacity as the Jail's Executive Medical Director and Interim Executive Medical Director, respectively, because they were responsible for overseeing the Dental Clinic and ensuring that the dentists provided adequate dental care.  Specifically, Baughman claims that the extraction-only policy enforced by the dentists violated his constitutional rights and that this violation was caused by Drs. Seale and Guice's failure to adequately staff the Dental Clinic or train and supervise the dentists. Baughman adds that Dr. Chin is also liable as a supervisor for failing to train Dr. Harper to provide adequate dental care.

Drs. Seale and Guice argue that, as supervisory officials without direct personal

---

[152]    *Id*. at 144:9-146:3.

56

involvement in the dental care provided, they properly relied on the dentists, who were trained and licensed by the State of Texas, to provide adequate dental care consistent with the Jail's written policies, which were independently reviewed and approved by TCJS and NCCHC.  Drs. Seale and Guice argue further that Baughman cannot demonstrate liability on their part because he cannot establish that they acted with the requisite deliberate indifference.

As noted earlier, a supervisory official can be liable under 42 U.S.C. § 1983 where the failure to train or supervise amounts to deliberate indifference.  *See Porter*, 659 F.3d at 446; *Goodman*, 571 F.3d at 395.  Both the Supreme Court and the Fifth Circuit have emphasized that "'[d]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Davis*, 406 F.3d at 381 (quoting *Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)).  Where supervisory liability is concerned, "[p]roof of deliberate indifference normally requires a plaintiff to show a pattern of violations and that the inadequate training or supervision is 'obvious and obviously likely to result in a constitutional violation.'" *Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010) (quoting *Davis*, 406 F.3d at 381 (citations omitted)).  This requires a plaintiff to "demonstrate a pattern of similar violations." *Davis*, 406 F.3d at 383.

It is undisputed that neither Dr. Seale nor Dr. Guice is a dentist and neither personally participated in the care that was provided to Baughman.  There is no evidence that contradicts Drs. Seale and Guice's testimony that decisions about the level of dental care provided at the Jail were delegated to the dentists to make in the exercise of their professional judgment.[153]  As far as Dr. Seale and Dr. Guice knew, the Jail's written policy on providing dental care specifies that detainees will be provided with "oral treatment" that is "not limited to extractions[.]"[154] Dentists at the Jail were allowed full authority to implement this policy as they saw fit.[155]  In doing so, the dentists developed their own policy or practice of offering extractions only for complaints of pain associated with tooth decay, with no access to fillings, root canals, crowns, or other restorative treatment unless the detainee could arrange for a private dentist come into the Jail and provide this type of care at the detainee's expense.

Dr. Guice, who has only served as Interim Director since September of 2015, testified at his deposition that he was unaware that extractions were the only treatment

---

[153]     Guice Dep. [Doc. # 188, Ex. 1], at 146:2-13, 150:14-22; Seale Dep. [Doc. # 188, Ex. 2], at 134:16-20.

[154]     HCSO Manual of Policies ans Procedures for Health Services, No. J-E-06 [Doc. # 190, Ex. 28], at Bates No. HC/Baughman 5729.

[155]     Guice Dep. [Doc. # 188, Ex. 1], at 146:2-13; Seale Dep. [Doc. # 188, Ex. 2], at 134:16-135:17.

provided for tooth decay by Jail dentists.[156]  Dr. Guice did not directly oversee the work performed by the dentists,[157] and he had no role in developing the Jail's current policy on dental care, which he admittedly read for the first time at his deposition.[158] Otherwise, he had little personal interaction with the dentists and his supervisory efforts involving them appear to have been limited to listening to any concerns raised during quarterly staff meetings.[159]  The record contains no evidence showing that any concern was brought to Dr. Guice's attention during one of these meetings, or at any other time, regarding deficient practices at the Dental Clinic.  According to Dr. Guice, the dentists never reported any problem to him regarding the level of care they were able to provide.[160]

Dr. Seale also testified at his deposition that he did not know that extraction was the only treatment offered for indigent inmates with tooth decay.[161]  He acknowledged that while he was the Executive Director he received regular reports from the Dental Clinic, showing that hundreds of extractions were being done by the dentists each

---

[156]     Guice Dep. [Doc. # 188, Ex. 1], at 157:18-21.

[157]     *Id*. at 146:2-24.

[158]     *Id.* at 145:4-10.

[159]     *Id*. at 144:4-20, 147:24-148:11.

[160]     *Id*. at 163:6-164:3.

[161]     Seale Dep. [Doc. # 188, Ex. 2], at 141:2-5, 143:2-144:3.

month, but that "zero" fillings were provided.[162]  Relying on the dentists to provide

adequate care,[163] Dr. Seale assumed that the extractions were being done because they

were indicated by "clinical judgment."[164]

Drs. Seale and Guice concede that there is no particular training program for

dentists at the Jail and they also appear to concede that no real effort was made to

ensure that the level of care provided in the Dental Clinic complied with the Jail's

written policies or generally accepted standards such as those demanded by the TCJS

or the NCCHC.  Baughman points to the report reviewed by Dr. Seale about the

number of extractions being done by Jail dentists on a monthly basis, showing that no

fillings were provided in 2016, and suggests that this should have placed him on

notice that an extraction-only policy was being enforced in a manner that was contrary

to the Jail's written policy of providing treatment "not limited to extractions."[165]

Again, however, there is no evidence that Drs. Seale or Guice knew that extractions

were being done where not medically necessary, which is the central premise behind

Baughman's claim that he was denied adequate dental care because extraction was the

---

[162]    *Id*. at 144:8-146:9.

[163]    *Id*. at 134:16-135:17.

[164]    *Id.* at 146:15-147:5.

[165]    Dental Services Clinic Monthly Report 2016 [Doc. # 190, Ex. 29], at Bates No.
HC/Baughman 9357.

only treatment offered for his decayed teeth when a filling would have solved the problem.  There is ample authority, as set forth above, holding that offering to extract a painful, decaying tooth, does not demonstrate deliberate indifference and does not violate the Eighth Amendment if the tooth is not viable.  *See McQueen*, 54 F. App'x 406, 2002 WL 31688891, at *1; *see also Greywind*, Civil No. 1:10-006, 2011 WL 4750962, at *7-8 (collecting cases).

A showing of deliberate indifference requires a plaintiff to "show that the failure to train reflects a 'deliberate' or 'conscious' choice to endanger constitutional rights." *Davis*, 406 F.3d at 383 (quoting *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)).  There is insufficient evidence that Drs. Seale or Guice, who are not dentists, actually knew, or had reason to suspect, that the Jail dentists had developed a practice of only offering extractions for tooth decay if a detainee could not afford to hire his own dentist under circumstances in which extraction was not medically necessary.  "[N]otice of a pattern of *similar* violations is required" in order to impose liability on a supervisory official.  *Davis*, 406 F.3d at 383 (emphasis in original).  Other than pointing to the deficient care that he received, Baughman does not demonstrate a pattern of similar violations that would have placed Drs. Seale or Guice on notice of a problem.  This is insufficient to impose supervisory liability under § 1983.  *See Davis*, 406 F3d at 382-83; *see also Connick v. Thompson*, — U.S. —, 131 S. Ct. 1350,

1360-61 (2011) (explaining that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train") (quoting *Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)).  In that respect, the Supreme Court has recognized that where the allegedly untrained employees are licensed professionals, "recurring constitutional violations" are not the "obvious consequence" of failing to provide in-house training on how to do their jobs. *Connick*, 131 S. Ct. at 1363.  Thus, Baughman fails to show that Dr. Seale, Dr. Guice, or any other supervisory official at the Jail, "ignored a known or obvious risk" that unconstitutionally deficient care would result without a particular training program in place. *See Brown*, 623 F.3d at 255; *see also Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 459 (5th Cir. 2001).  Based on this record, Dr. Seale and Dr. Guice are entitled to qualified immunity from Baughman's claims against them, as supervisors of the Jail's medical facilities, regarding his dental care.

To the extent that Baughman blames Dr. Chin for failing to train Dr. Harper, his claim fares no better.  There is evidence that, as the more senior dentist, Dr. Chin and the dental assistants were responsible for getting Dr. Harper "up to speed" on the

Jail's policies and practices of providing care when Dr. Harper was hired in 2012.[166]
However, there is no evidence in the record showing that Dr. Harper was subordinate
to Dr. Chin or that it was Dr. Chin's responsibility to supervise or train Dr. Harper to
provide adequate dental care.[167]  Likewise, there is no evidence that Dr. Harper, as a
licensed professional, required instruction in the practice of dentistry when he
commenced his employment at the Jail.  Baughman does not establish that Dr. Chin
is liable as a supervisor and, therefore, Dr. Chin is also entitled to qualified immunity
from this claim.

### E.    Retaliation Claims

Baughman contends that Dr. Seale, Davis, and Rossi improperly retaliated
against him by imposing restrictions on his commissary privileges in April 2015, after
he sent a letter to TCJS, complaining about his medical and dental care at the Jail.[168]
"To prevail on a claim of retaliation, a prisoner must establish (1) a specific
constitutional right, (2) the defendant's intent to retaliate against the prisoner for his
or her exercise of that right, (3) a retaliatory adverse act, and (4) causation," *i.e.*, that

---

[166]    Chin Dep. [Doc. # 188, Ex. 6], at 34:14-37:17; Harper Aff. [Doc. # 183-2], at ¶ 2.

[167]    Chin Dep. [Doc. # 188, Ex. 6], at 31:13-32:7 (indicating that Dr. Chin and Dr. Harper
were "on the same level" and that the extent of Dr. Chin's supervisory function, if any, was
limited to managing "patient flow").

[168]    Fourth Amended Complaint [Doc. # 134], at ¶¶ 62-63.

the retaliatory act was motivated by the retaliatory intent. *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998); *see also Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006). A prisoner must allege more than his personal belief that he is the victim of retaliation. *See Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997). Mere conclusory allegations of retaliation will not be enough to withstand a properly supported motion for summary judgment. *See Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).

Dr. Seale, Davis, and Rossi argue that they are entitled to qualified immunity because Baughman has no admissible evidence to demonstrate any retaliatory intent on their part and that he cannot otherwise establish the requisite causation. To establish causation, the plaintiff must demonstrate that "but for the retaliatory motive the complained of incident . . . would not have occurred." *Johnson*, 110 F.3d at 310. "This places a significant burden on the inmate." *Id*. "The inmate must produce direct evidence of motivation or 'allege a chronology of events from which retaliation may plausibly be inferred.'" *Id*. (quoting *Cain v. Lane*, 857 F.2d 1139, 1143 n. 6 (7th Cir. 1988)).

Baughman does not present any direct evidence of retaliatory motive or intent and the chronology does not contain evidence from which retaliation may be inferred. The record shows that Baughman mailed his letter to TCJS on March 30, 2015,

64

complaining about inadequate medical and dental care at the Jail.[169]  Before he sent

that letter, medical records show that Rossi met with Baughman on February 2, 2015,

regarding complaints he had made about the heart-healthy diet recommended by

medical providers, which is considered appropriate for diabetics.[170]  Baughman, who

weighed 375 pounds when he was booked in to the Jail on April 4, 2014, weighed 428

pounds on the date he met with Rossi and was having difficulty controlling high blood

sugar as the result of his food choices.[171]  This evidence shows that Baughman's

health care was significantly complicated by his lack of compliance with the diet

recommended by medical providers and his consumption of inappropriate food items

from the commissary.[172]  Review of Baughman's commissary records showed that he

---

[169]     Letter [Doc. # 190, Ex. 16], at Bates No. HG/Baughman 9340-9341.

[170]     Davis Aff. [Doc. # 179-7], at ¶ 11 (referencing a Nutrition Note dated February 2, 2015).  Baughman has claimed that the heart-healthy diet is not appropriate for patients with diabetes.  *See* Fourth Amended Complaint [Doc. # 134], at ¶ 24.  His own expert disputes this, however, noting that the heart-healthy diet with consistent carbohydrate content at each meal is optimum for patients such as Baughman, who suffer from diabetes. *See* Madoff Report [Doc. # 190, Ex. 6], at 9; *see also* Letter from Dr. Susan Morris ("Morris Letter") [Doc. # 190, Ex. 7], at 2.

[171]     Davis Aff. [Doc. # 179-7], at ¶ 11; Seale Aff. [Doc. # 179-3], at ¶ 12 (noting that Baughman's care was significantly complicated by his lack of compliance with recommended diet and consumption of commissary foods).

[172]     Seale Aff. [Doc. # 179-3], at ¶ 12.

regularly purchased foods high in unhealthy carbohydrates.[173] Baughman complained to a different staff member on February 13, 2015, asking to be placed on the "Adkin's diet" and threatening to sue if his dietary demands were not met.[174] After reviewing the medical records of Baughman's condition and the commissary records of his repeated purchases of food items that were hazardous to his medical condition, Davis told "jail commissary staff" to restrict Baughman's commissary purchases so that he could not harm himself by purchasing food that was dangerous to his health.[175] Acting on a verbal request from Davis, Rossi imposed restrictions on Baughman's commissary privileges on April 13, 2015, because he was "consistently purchasing items that are inappropriate for his multiple medical conditions."[176]

Dr. Seale notes that restrictions on commissary privileges are "common for patients who present complications in the delivery of health care because of their lack of compliance with dietary recommendations" and denies that he had any involvement

---

[173]   Davis Aff. [Doc. # 179-7], at ¶ 11.  Baughman's commissary purchases reflect that he made repeated purchases of high calorie and high sodium sweets, starches, and snack foods that are entirely inconsistent with either a heart-healthy diabetic diet or the Atkins diet. *See* Morris Letter [Doc. # 190, Ex. 7], at 2.

[174]   Davis Aff. [Doc. # 179-7] at ¶ 13.

[175]   *Id*. at ¶ 14.

[176]   Nutrition Note [Doc. # 190, Ex. 17], at Bates No. HC/Baughman 9318.

with the decision to impose commissary restrictions against Baughman.[177] Davis and Rossi also maintain that they had no knowledge that Baughman had sent a letter to TCJS complaining about the medical care at the Jail at the time the commissary restrictions were imposed.[178]

Baughman presents nothing to refute the defendants' evidence and he does not otherwise demonstrate that Dr. Seale, Davis, or Rossi had any intent to retaliate against him.  Because the defendants have filed a properly supported motion for summary judgment, Baughman's conclusory allegations of retaliation are not sufficient to raise a genuine issue of material fact.  *See Woods*, 60 F.3d at 1166. Baughman makes no evidentiary showing that the defendants intended to retaliate against him or that, but for any retaliatory intent, the commissary restrictions would not have been imposed.  Baughman accordingly does not raise a genuine fact issue of a constitutional violation.  Accordingly, Dr. Seale, Davis, and Rossi are entitled to qualified immunity and summary judgment on Baughman's retaliation claim.

## IV.   ANALYSIS OF CLAIMS AGAINST HARRIS COUNTY

Baughman contends that Harris County is liable as a municipal entity for the failure of Jail medical and dental personnel to provide him with adequate care for his

---

[177]   Seale Aff. [Doc. # 179-3], at ¶ 32.

[178]   Davis Aff. [Doc. # 179-7] at ¶ 16; Rossi Aff. [Doc. # 183-3] at 2.

serious medical and dental needs.[179]  Invoking 42 U.S.C. § 1983, Baughman argues that Harris County is liable for the following deficient policies: (1) the widespread practice of not requiring fingersticks three times a day for insulin-dependent diabetics; (2) the refusal to provide dentures or restorative dental care for inmates with advanced tooth decay who are unable to pay for a private dentist to provide such care; and (3) the failure to train and supervise personnel who provide medical and dental care with respect to these issues.[180]  In addition, Baughman asserts that Harris County is liable under state law for the negligent failure to provide him with adequate medical and dental care.[181]  Harris County moves for summary judgment, arguing that Baughman does not establish that a constitutional violation occurred and that it is not liable as a municipal entity under any theory.[182]  The parties' contentions are examined below under the legal standard that governs municipal liability, starting with Baughman's claims under 42 U.S.C. § 1983.

## A.    Municipal Liability under 42 U.S.C. § 1983

Municipalities are deemed to be "persons" susceptible to suit under § 1983.  *See*

---

[179]    Fourth Amend. Compl. [Doc. # 134] at 16-18.

[180]    Plaintiff's Response to Harris County's Motion for Summary Judgment [Doc. # 188], at 13-29.

[181]    *Id.* at 30-31.

[182]    Defendant Harris County's Motion for Summary Judgment [Doc. # 181], at ¶ 2.

*Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).  Municipal liability, however, cannot be sustained under a theory of *respondeat superior* or vicarious liability for wrongdoing by a municipal employee.   *See id.* at 691; *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009).  A municipality is only liable under § 1983 for acts that are "directly attributable to it 'through some official action or imprimatur.'" *James*, 577 F.3d at 617 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).  To proceed beyond the summary judgment stage, "a plaintiff making a direct claim of municipal liability must demonstrate a dispute of fact as to three elements: that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional rights." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 395 (5th Cir. 2017) (citing *Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015)).

Harris County maintains that Baughman cannot establish any of the necessary prerequisites for municipal liability because (1) he does not demonstrate that his constitutional rights were violated, and (2) even if his constitutional rights were violated, no official policy was to blame.[183]  For reasons outlined in more detail above, Baughman has not demonstrated that he has been denied adequate medical care for diabetes in the form of thrice-daily fingersticks in violation of the Eighth Amendment.

---

[183]   Defendant Harris County's Motion for Summary Judgment [Doc. # 181], at ¶ 22.

Baughman also has failed to establish that he was denied adequate dental care in the form of partial dentures.  Absent a showing of a genuine fact issue of a constitutional violation, Harris County is entitled to summary judgment on these claims and on Baughman's claim that Harris County failed to train or supervise employees with respect to these matters.

There are unresolved fact issues, however, about whether Baughman was denied adequate dental care for tooth decay in violation of the Eighth Amendment pursuant to a widespread practice or custom of offering extractions as the only available treatment option for inmates with cavities, but with no funds to pay for care by a private dentist.  Arguing further that an extraction-only practice evolved because the Dental Clinic is understaffed,[184] Baughman contends that this practice rises to the level of an official policy that was the cause of his suffering and is attributable to Harris County for purposes of liability.  *See Ramos*, 639 F.2d at 576 (finding that a dental clinic open only 40 hours a week was constitutionally inadequate to serve the dental needs of 1,400 inmates).

Harris County argues that, even assuming that a deficient practice was the moving force behind a violation of Baughman's right to adequate dental care, there

---

[184]     *See* Shulman Report [Doc. # 190,. Ex. 26] at 31-32; Chin Dep. [Doc. # 190, Ex. 6], at 40:7- 41:6 (noting that dentists at the Jail can identify periodontal disease, but cannot treat it because of "the amount of patients" and the small number of staff).

is no evidence that care was denied as the result of an official policy adopted by an official policymaker who had notice of a problem, but was deliberately indifferent to the likelihood that a constitutional violation would occur.

Official policy, which establishes municipal culpability, "can arise in various forms." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009). Official policy usually exists in the form of "written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James*, 577 F.3d at 617 (citations and quotations omitted)). "A policy is official only 'when it results from the decision or acquiescence of the municipal officer or body with "final policymaking authority" over the subject matter of the offending policy.'" *Id*. (quoting *Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701, 737 (1989)).

Assuming that an extraction-only policy exists, Harris County maintains that it is not an *official* policy because the Harris County Sheriff is the final policymaker for all matters involving the Jail and there is no evidence showing that the Sheriff had actual or constructive knowledge of the practice about which Baughman complains.[185] Baughman contends that there is a fact issue about whether the Sheriff actually exercises control over healthcare matters at the Jail, noting that Dr. Seale and Dr.

---

[185]    Defendant Harris County's Motion for Summary Judgment [Doc. # 181], at ¶ 24.

Guice were the officials vested with authority to make policy in that area.[186]  Where

municipal liability is concerned, however, "the identity of the final policymaker is a

question of law — specifically a question of state law — and not a question of fact."

*Groden v. City of Dallas, Tex.*, 826 F.3d 280, 284 (5th Cir. 2016) (citing *City of St.*

*Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) ("We begin by reiterating that the

identification of policymaking officials is a question of state law.").   "[I]t has long

been recognized that, in Texas, the county Sheriff is the county's final policymaker

in the area of law enforcement, not by virtue of the delegation by the county's

governing body but, rather, by virtue of the office to which the sheriff has been

elected." *Turner v. Upton County, Tex.*, 915 F.2d 133, 136 (5th Cir. 1990) (citing

---

[186]     Plaintiff's Response to Harris County's Motion for Summary Judgment [Doc. # 188], at 14-16.  In making this argument, Baughman references two recent cases from Louisiana which call into question whether a parish sheriff is the final policy maker where Jail medical care is at issue.  *See Nagle v. Gusman*, Civ. No. 12-1910, 2016 WL 768588, at *8 (E.D. La. Feb. 26, 2016) (interpreting La. Stat. § 13.5539(c), which is nearly identical to the Texas statute making the sheriff "keeper" of the jail, and concluding that the medical director of a jail may qualify as a policymaker for purposes of municipal liability); *Thompson v. Ackal*, Civ. No. 15-02288, 2016 WL 1394352, at *5 (W.D. La. March 9, 2016), report and recommendation adopted, 2016 WL 1391047 (W.D. La. April 6, 2016) (rejecting defendants' argument that the sheriff is the only final policymaker regarding medical care for inmates where doctors designed and implemented policies, procedures, and protocol for delivering health care to inmates).  Neither case is binding authority and each is distinguishable.  The *Nagle* case involved claims of individual liability on the part of the medical director as policymaker, and not municipal liability.  *See Nagle*, 2016 WL 768588, at *8.  Likewise, the *Thompson* case involved policies implemented by a private contractor which had policymaking authority pursuant to the express terms of its written contract with the municipality that it served.  *See Thompson*, 2016 WL 1394352, at *5-6.

*Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980)); *Colle v. Brazos County*, 981 F.2d 237, 244 (5th Cir. 1993) (same).  Where the care of inmates is concerned, state law specifically provides that "[t]he sheriff of each county is the keeper of the county jail." Tex. Loc. Gov't Code § 351.041(a).  As such, a county sheriff is required to "safely keep all prisoners committed to the jail by a lawful authority, subject to an order of the proper court."  *Id.*  "The sheriff may appoint a jailer to operate the jail and meet the needs of the prisoners, but the sheriff shall continue to exercise supervision and control over the jail."  *Id.* at § 351.041(b).

The evidence reflects that the Sheriff has appointed his Chief Deputy to serve as administrator of the Jail, and that Dr. Seale and Dr. Guice reported to him through a chain of command.[187]  If additional dentists or other staff were needed, Dr. Seale and Dr. Guice could make a recommendation through the chain of command, which would be presented to the Sheriff and the Harris County Commissioner's Court.[188] According to Dr. Seale, the Sheriff was ultimately responsible for staffing and funding for Jail operations.[189]  This indicates that the Harris County Sheriff is the final

---

[187]     Guice Dep. [Doc. # 188, Ex. 1], at 28:7-17; Seale Dep. [Doc. # 188, Ex. 2], at 25:23-27:2.

[188]     Guice Dep. [Doc. # 188, Ex. 1], at 160:20-163:16; Seale Dep. [Doc. # 188, Ex. 2], at 48:7-21, 153:14-20, 184:6-15.

[189]     Seale Dep. [Doc. # 188, Ex. 2], at 152:15-153:20.

policymaker not only in the area of law enforcement, but also for operation of the Jail and the medical services provided at County expense.

There is no evidence showing that the practice or policy with which Baughman takes issue was ever adopted or endorsed by the Sheriff, thereby making it official for purposes of municipal liability. Even assuming that Dr. Seale and Dr. Guice could be considered final policymakers, it is undisputed that the policy of offering extractions as the only remedy for tooth decay was developed and implemented by dentists at the Jail. The County has had at all times relevant to Baughman's claims a written policy to the contrary, which called for oral treatment that was not limited to extractions. Harris County presents evidence that the Jail Health Services Division and its written policies were routinely approved and accredited following regular inspections by the TCJS and NCCHC, without any indication that these agencies or the Sheriff was aware that the Dental Clinic was operating without adequate staff or that the dental care being provided was constitutionally inadequate.[190] Although Dr. Chin has admitted that extraction was the only treatment being provided for cavities, neither Dr.

---

[190]   Seale Aff. [Doc. # 179-3], at ¶¶ 27-29; Guice Aff. [Doc. # 179-4], at ¶¶ 5-8, 37-38. Of course, accreditation status, standing alone, is not dispositive of the constitutionality of medical care provided at a correctional facility. *See Ruiz v. Johnson*, 37 F. Supp. 2d 855, 902 (S.D. Tex. 1999), *rev'd on other grounds, Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001). Harris County argues, nevertheless, that it should be able to rely on the accreditation process and its regimen of inspections, both planned and unannounced, as one manner of providing notice of systemic problems that may need to be rectified by official means.

Seale nor Dr. Guice were aware of an extraction-only practice at the Dental Clinic where extraction was not medically warranted.[191]  As noted previously, Dr. Seale and Dr. Guice relied on licensed dentists to implement Jail policies in a manner consistent with governing standards of care by using their professional judgment and expertise. Dr. Seale testified further at his deposition that he believed that two dentists were adequate to meet the acute needs typically presented by detainees in the Jail setting and Baughman presents no evidence showing that Dr. Seale had a reason to question whether the Dental Clinic could not meet these needs due to a lack of staff.[192]  Based on this record, there is no evidence that the Harris County Sheriff, or any other official with policymaking authority at the Jail, had actual or constructive knowledge of the problem of which Baughman complains, but that these officials consciously chose to enforce an extraction-only policy with deliberate indifference to the fact that a constitutional violation was the likely result.  This is fatal to Baughman's claim for municipal liability.  *See*, *e.g.*, *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) ("Knowledge on the part of a policymaker that a constitutional violation will most likely result from a given official custom or policy is a *sine qua non* of

---

[191]    Guice Dep. [Doc. # 188, Ex. 1], at 157:18-21; Seale Dep. [Doc. # 188, Ex. 2], at 141:2-5, 143:2-144:3.

[192]    Seale Dep. [Doc. # 188, Ex. 1], at 126:12-127:19, 153:4-13.  Dr. Chin likewise disputed at his deposition that two dentists were inadequate to meet the needs of the Jail's fluctuating population.  *See* Chin Dep. [Doc. # 188, Ex. 6], at 191:1-193:13.

municipal liability under section 1983."); *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc) ("Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policymaking authority.").

Baughman's contention that Harris County is liable for failing to train or supervise dentists at the Jail fails for similar reasons.  In that respect, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 131 S. Ct. at 1359 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985)).  For liability to attach under § 1983, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id*. (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  The Supreme Court has emphasized that deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*. at 1360 (quoting *Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)).  For this reason, a pattern of similar constitutional violations is required to trigger municipal liability. *Id*. "Without notice that a course of training is deficient in any respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of

constitutional rights." *Id.*

As noted previously in connection with the claims against Dr. Seale and Dr. Guice, Baughman does not present evidence of a pattern of violations similar to those alleged by him that were the product of any lack of training or supervision on the part of a municipal actor.  Accordingly, Baughman does not satisfy the high standard of proof for purposes of imputing liability to a municipal entity under § 1983.  *See Connick*, 131 S. Ct. at 1359-60.  Absent a genuine issue of material fact on this question, Harris County is entitled to summary judgment on Baughman's claims under 42 U.S.C. § 1983.

**B.      State Law Negligence Claims**

Baughman alleges that Harris County has failed to ensure that diabetes and his dental needs were treated in a manner that comports with the "good and accepted" standard of care for medical and dental practices.[193] Thus, Baughman contends that Harris County is liable for what amounts to negligence or malpractice by health care providers at the Jail.  *See Blan v. Ali*, 7 S.W.3d 741, 744 (Tex. App. — Houston [14th Dist.] 1999, no pet.) (listing the elements of a *prima facie* claim for medical malpractice, which requires a showing that a provider breached the applicable standard of care).

---

[193]     Fourth Amended Complaint [Doc. # 134] at ¶¶ 72-77.

Harris County invokes sovereign immunity, which protects government entities from vicarious liability for the tortious acts of agents or employees acting in the scope of their employment.[194]  *See Davis v. City of Palestine*, 988 S.W.2d 854, 857 (Tex. App. — Tyler 1999, no writ).  Under this principle, the State of Texas and other governmental entities are immune unless liability is waived by a constitutional or legislative provision.  *See Univ. of Tex. Med. Branch of Galveston v. York*, 871 S.W.2d 175, 177 (Tex. 1994).

Baughman argues that immunity is waived pursuant to the Texas Tort Claims Act ("TTCA"), which provides that "[a] governmental unit in the state is liable for . . . personal injury . . . caused by a condition or use of tangible personal . . . property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law."  TEX. CIV. PRAC. & REM. CODE § 101.021.

Pointing to § 101.021 of the TTCA, Baughman argues that his claims are not barred by sovereign immunity because they involve Harris County's use of tangible property in the form of insulin injections and dental tools to effect extractions.[195]

---

[194]    As noted previously, the Court dismissed with prejudice similar state law negligence claims lodged by Baughman against the individual defendants as precluded by an election-of-remedies provision found in § 101.106(c) of the Texas Civil Practice and Remedies Code. *See* Memorandum and Order dated October 21, 2016 [Doc. # 160], at 6-7.

[195]    Plaintiff's Response to Harris County's Motion for Summary Judgment [Doc. # 188], at 7, 30-31.

Baughman's underlying claims, however, concern the allegedly deficient care involved in the exercise, or lack of exercise, of professional medical judgment. As such, Baughman's claims do not fit within the statutory waiver of sovereign immunity available under the TTCA. *See Texas Dep't of Crim. Justice v. Miller*, 51 S.W.3d 583, 587-89 (Tex. 2001) (concluding that a negligent failure to diagnose or treat meningitis stemming from an error of medical judgment was not within the statutory waiver). Accordingly, Harris County is entitled to summary judgment on Baughman's negligence claims.

## V.    <u>REMAINING CLAIMS AND DEFENDANTS</u>

Remaining for trial is Baughman's claim that Drs. Chin and Harper violated his constitutional rights by denying him adequate dental care in the form of standard fillings to treat advanced tooth decay in one or more of his teeth that were ultimately extracted.

It is not apparent that Baughman has a claim against former Sheriff Adrian Garcia or former Sheriff Ron Hickman in their personal capacity where his dental care is concerned, although neither of these defendants has moved for summary judgment. Likewise, it is unclear what claims Baughman intends to continue litigating against Renee Hinojosa, who also did not move for summary judgment. In that respect, Baughman has asserted that Hinojosa violated his constitutional rights by prescribing

a heart-healthy diet, which he claims was inappropriate for his diabetes, although even Baughman's own medical expert agrees that this diet is appropriate for diabetic patients.[196]   The parties' counsel should address in the joint pretrial order whether Garcia, Hickman, and Hinojosa should remain as defendants in this lawsuit.

## VI.   CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1.   The motion for summary judgment by Defendants Dr. Michael Seale, Dr. Marcus Guice, Bobby Davis, Sharon Lambi, and Beverly Howard [Doc. #179] is **GRANTED**.

2.   The motion for summary judgment by Harris County [Doc. # 181] is **GRANTED**.

3.   The motion for summary judgment by Defendants Dr. Edwin Chin, Dr. Allen Harper, and Catherine Rossi [Doc. # 183] is **GRANTED**, in part, with respect to the retaliation claims against Catherine Rossi, the claim that Drs. Chin and Harper denied Baughman adequate dental care in the form of dentures, and the claim of supervisory liability against Dr. Chin. The motion is **DENIED** with respect to the claim that Drs. Chin and

---

[196]     *See* Madoff Report [Doc. # 190, Ex. 6], at 9 (noting that the heart-healthy diet with consistent carbohydrate content at each meal is appropriate for patients who suffer from diabetes); *see also* Morris Letter [Doc. # 190, Ex. 7], at 2 (same).

Harper denied Baughman adequate dental care in the form of standard fillings to treat tooth decay in violation of the Eighth Amendment.

The Clerk will provide a copy of this order to the parties.

SIGNED at Houston, Texas on <u>May 26</u>, 2017.

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE